**Everett MENDELSOHN, et al., Plaintiffs,**

v.

**Edwin MEESE, III, Attorney General of the United States, Defendant.**

**No. 88 Civ. 2005 (ELP).**

United States District Court, S.D. New York.

April 12, 1988.

---

Rudolph W. Giuliani, U.S. Atty., Peter C. Salerno, Asst. U.S. Atty., U.S. Attys. Office, S.D.N.Y., New York City, John R. Bolton, Asst. Atty. Gen., David J. Anderson, Vincent M. Garvey, Mona Butler, U.S. Dept. of Justice, Washington, D.C., for the Atty. Gen.

Leonard B. Boudin, Michael Krinsky, David Golove, Nicholas E. Poser, David B. Goldstein, Rabinowitz, Boudin, Standard, Krinsky & Lieberman, New York City, for plaintiffs Mendelsohn, et al.

## ORDER AND OPINION

PALMIERI, District Judge.

This case involves novel and delicate questions of constitutional and international law arising out of the passage by Congress of the Anti-terrorism Act of 1987 [1] (the "Act"). Presently before the Court

---

1. Title X of the Foreign Relations Authorization Act for Fiscal Years 1988–89. Pub.L. 100–204, §§ 1001–1005, 101 Stat. 1331, 1406–07; 22 U.S. C.A. §§ 5201–5203 (West Supp.1988). The Act is set out as an appendix.

are the motions of three individual plaintiffs for preliminary injunctive relief. Fed. R.Civ.P. 65.

## I

### The Anti-terrorism Act of 1987

The Act makes specific findings regarding the activities of the Palestine Liberation Organization (the "PLO") as an international terrorist organization. 22 U.S.C. A. § 5201(a) (West Supp.1988). It sets forth Congress' determination that "the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States." Id. § 5201(b). The Act prohibits three kinds of activities when undertaken with the purpose of furthering the interests of the PLO: receiving anything of value except informational material from the PLO; expending funds from the PLO; and, "notwithstanding any provision of law to the contrary," establishing or maintaining "an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of" the PLO. Id. § 5202. The Attorney General is charged with enforcement of the Act, and the Act specifically provides for the grant of injunctive and any other equitable relief in any district court of the United States for a district in which a violation of the Act occurs. Id. § 5203.

## II

### The Procedural Posture

On March 22, 1988, the day after the Act took effect, the Attorney General brought an action on behalf of the United States pursuant to the enforcement provision of the Act, 22 U.S.C.A. § 5203(a) (West Supp. 1988), against the PLO and several of its employees for a permanent injunction closing the offices of the PLO's Permanent Observer Mission to the United Nations and restraining the defendants from continuing to violate the Act (the "enforcement action"). *United States v. Palestine Liberation Organization, et al.*, 88 Civ. 1962 (ELP) (S.D.N.Y. filed March 22, 1988). In the enforcement action, the Government seeks no preliminary relief, and at oral argument before the Court in this case, the United States Attorney represented that the Government would take no further steps to enforce the Act until the litigation of the action has been concluded.

On March 23, 1988, the day after the enforcement action was commenced and two days after the Act took effect, Everett Mendelsohn and 64 other plaintiffs commenced this action against the Attorney General seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201–2202 that the Act is unconstitutional. Specifically, the complaint sets forth two requests for declaratory relief: first, it seeks a declaration that the Act is either inapplicable to the PLO's Permanent Observer Mission to the United Nations, or that, if it is applicable, that it is unconstitutional (the "mission claim"); second, the complaint seeks a declaration that application of the Act to the plaintiffs violates their first amendment rights and is thus unconstitutional (the "first amendment claim").

Jurisdiction and venue are proper in this Court. 28 U.S.C. §§ 1331 and 1391(e). Of the 65 plaintiffs in the declaratory judgment action, three presently seek a preliminary injunction from the Court restraining the Attorney General from enforcing the Act and declaring that they would not be engaging in unlawful activity if they undertook certain actions. Their motions are grounded exclusively on first amendment claims.

On March 29, 1988, the Court heard oral argument solely on the plaintiffs' motion for injunctive relief grounded on the first amendment claim. This was done at the urgent request of the plaintiffs and on an expedited basis. Argument on another individual plaintiff's motion for preliminary injunctive relief grounded on the mission claim has been postponed by consent until April 20, 1988. Thus the sole issue before the Court is whether the three plaintiffs about to be described have demonstrated their entitlement to injunctive relief in advance of trial.

### III

*The Plaintiffs Presently Seeking Preliminary Injunctive Relief*

Ibraham Abu–Lughod, Victor A. Ajlouny, and Nubar Hovsepian, all of whom are United States citizens, seek preliminary relief grounded on their first amendment claims.

Ibraham Abu–Lughod ("Lughod") is a professor of political science at Northwestern University in Evanston, Illinois. He asserts that he has been asked to attend a meeting in New York to explain the position and views of the PLO on the current situation in the Middle East, but is unable to do so unless his travel expenses are reimbursed by the PLO.

Victor A. Ajlouny ("Ajlouny") asserts that he has been requested by the Palestine Red Crescent Society, a constituent group of the PLO, to undertake a series of speaking engagements in the United States with funds provided the Palestine Red Crescent Society. He asserts that he is unable to do so unless his travel expenses are paid in advance.

Nubar Hovsepian ("Hovsepian") asserts that the PLO has requested that he establish and maintain an office in the United States to gather, write and disseminate materials on the subject of the Palestinian people. He also asserts that the PLO has requested him to arrange, through that office, for speakers and forums in which these subjects will be discussed. He has sworn that he is prepared to open the office immediately, has laid out his initial plans for the office's undertakings in some detail, and has received a commitment from individuals for the necessary funding, contingent only on a determination that it would be lawful under the Act to open the office.

### IV

*The Motions for Preliminary Injunctive Relief*

■ In this Circuit, preliminary injunctive relief will be granted only when the requesting party can show (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) both (i) that it has raised sufficiently serious questions going to the merits to make them a fair ground for litigation and (ii) that the balance of hardships tips decidedly in its favor. *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.,* 832 F.2d 1311, 1314 (2d Cir.1987).

### A. *Irreparable Harm.*

None of the three plaintiffs presently seeking preliminary relief has made a sufficient showing of irreparable harm.

■ Both Lughod and Ajlouny fail to demonstrate irreparable harm. They assert that their first amendment rights are being violated. It is true that the deprivation of a first amendment right, even for a short time, constitutes irreparable harm. *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976); *Salem Inn, Inc. v. Frank,* 501 F.2d 18, 21 (2d Cir.1974), *aff'd in part, rev'd in part* 244 U.S. 922, 926, 95 S.Ct. 2561, 2565, 45 L.Ed. 2d 648 (1975) (irreparable harm of first amendment deprivation not addressed by Supreme Court). But Lughod and Ajlouny are not being precluded from exercising their first amendment rights, just from being paid to do so. As the Government's counsel has urged, these plaintiffs are free to speak out as they please on any topic they please, and to whomever they please. They are not free to do so with funds provided by the PLO. While the Court recognizes the important relationship between the spending of money and the exercise of first amendment rights, *see generally First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed. 2d 707 (1978); *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), the plaintiffs here are not being precluded from spending money to exercise their first amendment rights. They are, in effect, asking the Court to declare that they have a protected first amendment interest in being subsidized by the PLO. Assuming that they do have such an interest, a preliminary injunction would not prevent irreparable harm. Should they ultimately prevail on the merits of their claim, their payments

from the PLO will only have been postponed. And the mere postponement of payment is not irreparable harm. *See Sperry International Trade, Inc. v. Government of Israel*, 670 F.2d 8, 12 (2d Cir.1982) (*quoting Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam)); *Stromfeld v. Smith*, 557 F.Supp. 995, 998–99 (S.D.N.Y. 1983).

■ Hovsepian presents a slightly different problem, without, however, demonstrating any irreparable harm. He is prepared to go forward immediately with the establishment of an office *at the behest of* the PLO, but *with no funds from* the PLO. He asserts that he has received a commitment from individuals for the money necessary to open this office and begin operations. But that commitment will be honored, he adds, only if he first receives a judicial declaration that it would be lawful under the Act to do so. He specifically declares: "My funders will not provide funds in the absence of an injunction staying the enforcement of the statute against the office." His argument that he cannot get a subsidy for the exercise of his first amendment rights without a preliminary injunction fails to demonstrate irreparable harm. In this respect, there is little significant difference between the claim of Hovsepian and the other two plaintiffs seeking preliminary injunctive relief. Hovsepian does not wish his funding activities to be "chilled" by the provisions of the Act which curtail the expenditure of funds by the PLO. Although his subsidy will not come from the PLO, the right he seeks to enforce is substantially similar to that of Lughod and Ajlouny. If the Act creates inconveniences in his pleas for private funding, this would not justify the grant of the extraordinary relief Hovsepian is requesting. The delay in his receipt of possible funding does not constitute irreparable harm. *See Sperry International Trade, supra; Stromfeld v. Smith, supra.*

The actual operation of his proposed office might present a different problem were it not for the representation in open Court by the United States Attorney that the Government will not take any further action to enforce the Act before the conclusion of this litigation. In light of that representation, Hovsepian is free to establish his office without fear of an enforcement action being brought before the conclusion of this litigation. It is relevant that the statute carries no penalties. It is also relevant that the statute permits the receipt of "informational material from the PLO" or any of its constituent groups or agents. The most drastic remedy the Government could seek beyond an injunction would presumably be the enforced restitution to the PLO of any funds received from the PLO. Operating his office without a preliminary injunction does not present Hovsepian with the risk, therefore, of anything other than the risk of having it closed after the conclusion of this litigation. But that risk would be just as great were the Court to grant him preliminary relief: he would still be presented with the risk of having his office closed after the conclusion of this litigation. He therefore would receive no real benefit from a preliminary injunction and can demonstrate no harm to himself or his alleged contributors except a possible delay in the receipt of money.

### B. Fair Grounds for Litigation.

■ Although the plaintiffs raise a number of legal arguments challenging the Act's constitutionality, only the contention that the Act constitutes an impairment of the First Amendment rights of these plaintiffs need be addressed here. While this issue is not ripe for decision in the present posture of the case, we believe it useful to express the Court's tentative view that these three plaintiffs have not, so far, demonstrated that their first amendment argument presents even fair grounds for litigation.[2]

**2.** Counsel for the Government has not yet been able to brief the matter fully because of the severely restrictive briefing schedule resulting from the filing of an order to show cause by the

plaintiffs at the outset of the case—an order which was granted *ex parte* by another Judge of this District before the case was permanently assigned. The show cause order obtained by

These plaintiffs are essentially asserting the right to be subsidized in order to speak out on an issue of obvious public importance. The Court is aware of no decision holding that anyone is ever entitled to a such a subsidy. Even Presidential election campaign subsidies are not mandated by the first amendment. *See Buckley v. Valeo,* 424 U.S. 1, 90, 93, 96 S.Ct. 612, 668, 670, 46 L.Ed.2d 659 (1976) ("public financing of Presidential elections as a means to reform the electoral process was clearly a choice within the granted power" of the General Welfare Clause; this choice furthers "pertinent first amendment values"); *see also Lyng v. International Union, United Auto Workers,* — U.S. —, —, 108 S.Ct. 1184, 1190, 99 L.Ed.2d 380, 56 U.S.L.W. 4268, 4270 (March 22, 1988) ("we have held in several contexts [including the first amendment] that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right.") (bracketed material in original; *quoting Regan v. Taxation with Representation of Washington,* 461 U.S. 540, 549, 103 S.Ct. 1997, 2003, 76 L.Ed.2d 129 (1983)).

Assessed in light of the analysis set forth in *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968), the alleged first amendment interest asserted by the plaintiffs does not appear to require that the Act be declared unconstitutional. Pursuant to the teachings of *O'Brien,*

> government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction of alleged first amendment freedoms is

no greater than is essential to the furtherance of that interest.

*Ibid; see also Palestine Information Office v. Shultz,* 674 F.Supp. 910, 918 (D.D.C. 1987), *app. pending* No. 87–5398 (D.C.Cir.).

Only weeks ago, the Supreme Court addressed the arguments of plaintiffs asserting first amendment interests in opposition to a statute which implicated the interests of the federal government in conducting foreign affairs. In *Boos v. Barry,* — U.S. —, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988), the Court struck down part of a District of Columbia statute which prohibited the display of any sign within 500 feet of a foreign embassy if that sign tends to bring that foreign government into "public odium" or "public disrepute." [3] The Court placed great emphasis on the fact that the former provision was content based, and held that it was not narrowly tailored to serve the compelling state interest asserted. *Id.* at — — —, 108 S.Ct. at 1165 (Part II–B). In particular, the Court discussed subsequent Congressional development of significantly less restrictive means to further the interest in protecting foreign diplomats, *Id.* at — — —, 108 S.Ct. at 1167 and concluded that "Congress no longer considers this statute necessary to comply with our international obligations." *Id.* at —, 108 S.Ct. at 1168.

In contrast to the statute struck down in *Boos v. Barry,* this Act appears capable of surviving attack under *O'Brien.* No contention has been put forward thus far that the Act was passed despite a lack of constitutional authority. Several of Congress' Article I powers would appear to provide authority for the Act. *See e.g.* Art. I § 8 cl. 1 (General Welfare); cl. 10 ("to define and punish ... Offences against the Law of Nations"); cl. 15 (to "suppress Insurrections and repel Invasions").

the plaintiffs gave the Government just six days (including a weekend) to respond. While attempts were made by this Court to secure a relaxation of the time limitations imposed on Government counsel, no agreement could be reached between the parties, with the result that the Government's brief could not represent the best efforts of its counsel. In addition, full briefing by the parties in the enforcement action is not expected for some time. It would be unfair at this early stage in the litigation for the Court to preclude their arguments, and the

Court does not intend to be understood to do so by this Opinion.

**3.** In the same opinion, the Court concluded that that part of the statute which prohibited any congregation of three or more persons within 500 feet of a foreign embassy withstands first amendment overbreadth scrutiny. *Id.* at — — —, 108 S.Ct. at 1169 (Part III). That part of the Court's opinion is not pertinent to this analysis.

It is beyond argument that the interest of the United States in opposing terrorism is a compelling one. This interest is unrelated to the prevention of free expression. The Act is very specific that it is not based upon a disagreement with the content of the message advocated by the PLO, but is designed instead to implement Congress' determination that the PLO is a terrorist organization and a threat to the interests of the United States and should not benefit from operating in the United States. 22 U.S.C.A. § 5201(b) (West Supp. 1988). Indeed, the fact that the Act specifically exempts the receipt of informational material from its prohibitions, *id.* § 5202(1), precludes the notion that its purpose was to cut off debate in this area. That exemption also provides strong support for the position that the Act appears to be narrowly enough drawn to pass constitutional muster. It does not restrict these plaintiffs' ability to speak or write or publish or even to spend their own money in support of the propaganda activities of the PLO. In light of the important interests the Act furthers, and the narrow restriction it imposes on these three plaintiffs, they do not, on the limited record presently before the Court, present even fair grounds for litigation, let alone a likelihood of success on the merits.

## C. Balance of Hardships.

■ These plaintiffs assert that the balance of hardships tips decidedly in their favor. The Court cannot agree. Against the hardship of waiting for possible reimbursement that befalls the plaintiffs who seek preliminary injunctive relief, we must weigh the important public interests implicated by the Act. The Act specifically forbids that behavior in which the plaintiffs seek the Court to declare they are entitled to engage. 22 U.S.C.A. § 5202 (West Supp.1988). The plaintiffs seek in effect the Court's sanction of facially illegal acts. They are precluded from accepting money from the PLO. Hovsepian is precluded from opening an office at the behest of the PLO; he is also forbidden to being subsidized by it even by indirection. The fact that Congress has seen fit to forbid these

actions is a specific expression of its view of the public interest and weighs heavily against the Court exercising its discretion to grant a preliminary injunction in this case. "The general rule is that equity will not interfere to prevent the enforcement of a criminal statute even though unconstitutional.... To justify such interference there must be exceptional circumstances and a clear showing that an injunction is necessary in order to afford adequate protection of constitutional rights...." *Spielman Motor Sales Co. v. Dodge,* 295 U.S. 89, 95, 55 S.Ct. 678, 680, 79 L.Ed. 1322 (1935); *accord Downstate Stone Co. v. United States,* 651 F.2d 1234, 1238 (7th Cir.1981); *cf. Socialist Workers Party v. Attorney General of the United States,* 642 F.Supp. 1357, 1430 (S.D.N.Y.1986) (declining to address claims for declaratory judgment of unconstitutionality of federal criminal statutes). None of the recognized exceptions to this rule are present here. *See Hynes v. Grimes Packing Co.,* 337 U.S. 86, 98–99, 69 S.Ct. 968, 976–977, 93 L.Ed. 1231 (1949) (injunction against allegedly invalid federal regulations which would deprive plaintiffs of property rights); *Philadelphia Co. v. Stimson,* 223 U.S. 605, 620–22, 32 S.Ct. 340, 344–45, 56 L.Ed. 570 (1912) (injunction against enforcement of unconstitutional criminal statute where enforcement officer is exceeding and abusing his authority).

## V

### Conclusion

None of the three plaintiffs presently before the Court has adduced sufficient proof of his entitlement to preliminary injunctive relief. The motions are therefore denied.

SO ORDERED.

## APPENDIX

## TITLE 22, UNITED STATES CODE (FOREIGN RELATIONS)

### CHAPTER 61—ANTI–TERRORISM—PLO

**§ 5201. Findings; determinations**

**(a) Findings**

The Congress finds that—

(1) Middle East terrorism accounted for 60 percent of total international terrorism in 1985;

(2) the Palestine Liberation Organization (hereafter in this title referred to as the "PLO") was directly responsible for the murder of an American citizen on the Achile Lauro cruise liner in 1985, and a member of the PLO's Executive Committee is under indictment in the United States for the murder of that American Citizen;

(3) the head of the PLO has been implicated in the murder of a United States Ambassador overseas;

(4) the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad;

(5) the PLO covenant specifically states that "armed struggle is the only way to liberate Palestine, thus it is an overall strategy, not merely a tactical phase";

(6) the PLO rededicated itself to the "continuing struggle in all its armed forms" at the Palestine National Council meeting in April 1987; and

(7) the Attorney General has stated that "various elements of the Palestine Liberation Organization and its allies and affiliates are in the thick of international terror".

**(b) Determinations**

Therefore, the Congress determines that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States.

**§ 5202. Prohibitions regarding the PLO**

It shall be unlawful, if the purpose be to further the interests of the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof, on or after [March 21, 1988]—

(1) to receive anything of value except informational material from the PLO or any of its constituent groups, any successor thereto, or any agents thereof; or

(2) to expend funds from the PLO or any of its constituent groups, any successor thereto, or any agents thereof; or

(3) notwithstanding any provision of law to the contrary, to establish or maintain an office, headquarters, premises or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof.

**§ 5203. Enforcement**

**(a) Attorney General**

The Attorney General shall take the necessary steps and institute the necessary legal action to effectuate the policies and provisions of this chapter.

**(b) Relief**

Any district court of the United States for a district in which a violation of this chapter occurs shall have authority, upon petition of relief by the Attorney General, to grant injunctive and such other equitable relief as it shall deem necessary to enforce the provisions of this chapter.