**UNITED STATES of America, Plaintiff,**

v.

**The PALESTINE LIBERATION ORGANIZATION, et al., Defendants.**

**No. 88 Civ. 1962 (ELP).**

United States District Court, S.D. New York.

June 29, 1988.

Rudolph W. Giuliani, U.S. Atty., Richard W. Mark, Asst. U.S. Atty., S.D.N.Y., New York City, John R. Bolton, Asst. Atty. Gen., Mona Butler, David J. Anderson, Vincent M. Garvey, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for Attorney Gen.

Ramsey Clark, Lawrence W. Schilling, New York City, for defendants Palestine Liberation Organization, PLO Mission, Zuhdi Labib Terzi, Riyad H. Mansour, Nasser Al–Kidwa and Veronica Kanaan Pugh.

Leonard B. Boudin, Michael Krinsky, David Golove, Nicholas E. Poser, David B. Goldstein, Rabinowitz, Boudin, Standard,

Krinsky & Lieberman, New York City, for defendant Riyad H. Mansour.[*]

Keith Highet, Joseph D. Pizzurro, Curtis, Mallet–Prevost, Colt & Mosle, New York City, for United Nations, amicus curiae.[**]

Sheldon Oliensis, President, Saul L. Sherman, Stephen L. Kass, Association of the Bar of the City of New York, New York City, for the Association of the Bar of the City of New York, amicus curiae.[***]

## ORDER AND OPINION

PALMIERI, District Judge.

The Anti-terrorism Act of 1987 [1] (the "ATA"), is the focal point of this lawsuit. At the center of controversy is the right of the Palestine Liberation Organization (the "PLO") to maintain its office in conjunction with its work as a Permanent Observer to the United Nations. The case comes before the court on the government's motion for an injunction closing this office and on the defendants' motions to dismiss.

### I

#### Background

The United Nations' Headquarters in New York were established as an international enclave by the *Agreement Between the United States and the United Nations Regarding the Headquarters of the United Nations* [2] (the "Headquarters Agree-

---

ment"). This agreement followed an invitation extended to the United Nations by the United States, one of its principal founders, to establish its seat within the United States.[3]

As a meeting place and forum for all nations, the United Nations, according to its charter, was formed to:

maintain international peace and security ...; to develop friendly relations among nations, based on the principle of equal rights and self-determination of peoples ...; to achieve international cooperation in solving international problems of an economic, social, cultural or humanitarian character ...; and be a centre for harmonizing the actions of nations in the attainment of these common ends.

U.N. Charter art. 1. Today, 159 of the United Nations' members maintain missions to the U.N. in New York. U.N. Protocol and Liaison Service, *Permanent Missions to the United Nations No. 262* 3–4 (1988) (hereinafter *"Permanent Missions No. 262"*). In addition, the United Nations has, from its incipiency, welcomed various non-member observers to participate in its proceedings. *See Permanent Missions to the United Nations: Report of the Secretary–General*, 4 U.N. GAOR C.6 Annex (Agenda Item 50) 16, 17 ¶ 14, U.N. Doc. A/939/Rev.1 (1949) (hereinafter *Permanent Missions: Report of the Secretary–General*). Of these, several non-member

---

[*] The above counsel moved to dismiss on Mansour's behalf and filed a brief. Following that motion, Clark and Schilling appeared for Mansour.

[**] The United Nations and the Association of the Bar of the City of New York both requested leave to appear as *amici curiae*. The court finds that both *amici* have an adequate interest in the litigation, even at the district court level, and that their participation is desirable. Leave to file is therefore granted. *See* S. & E.D.N.Y. Gen.R. 8; *cf.* Fed.R.App.P. 29; S.Ct.R.Prac. 36.3. It should be added that Carl–August Fleischhauer, Under–Secretary–General and Legal Counsel of the United Nations, was permitted to address the court at the outset of the arguments of counsel that took place on June 8, 1988.

[***] See footnote [**], ante.

[1] Title X of the Foreign Relations Authorization Act for Fiscal Years 1988–89. Pub.L. 100–204,

---

§§ 1001–1005, 101 Stat. 1331, 1406–07; 22 U.S.C.A. §§ 5201–5203 (West Supp.1988). It is attached hereto as Appendix A.

[2] G.A.Res. 169 (II), 11 U.N.T.S. 11, No. 147 (1947). 61 Stat. 756, T.I.A.S. No. 1676, *authorized by* S.J.Res. 144, 80th Cong., 1st Sess., Pub. L. 80–357, *set out in* 22 U.S.C. § 287 note (1982). We refer to the Headquarters Agreement as a treaty, since we are not concerned here with making a distinction among different forms of international agreement. The applicable law implicates all forms, including the Headquarters Agreement. *Weinberger v. Rossi*, 456 U.S. 25, 29–30, 102 S.Ct. 1510, 1514, 71 L.Ed.2d 715 (1982).

[3] H.Con.Res. 75, 79th Cong., 1st Sess., 59 Stat. 848 (1945).

nations,[4] intergovernmental organizations,[5] and other organizations [6] currently maintain "Permanent Observer Missions" in New York.

The PLO falls into the last of these categories and is present at the United Nations as its invitee. *See* Headquarters Agreement, § 11, 61 Stat. at 761 (22 U.S.C. § 287 note). The PLO has none of the usual attributes of sovereignty. It is not accredited to the United States [7] and does not have the benefits of diplomatic immunity.[8] There is no recognized state it claims to govern. It purports to serve as the sole political representative of the Palestinian people. *See generally* Kassim, *The Palestine Liberation Organization Claim to Status: A Juridical Analysis Under International Law,* 9 Den.J.International L. & Policy 1 (1980). The PLO nevertheless considers itself to be the representative of a state, entitled to recognition in its relations with other governments, and is said to have diplomatic relations with approximately one hundred countries throughout the world. *Id.* at 19.

In 1974, the United Nations invited the PLO to become an observer at the U.N.,[9] to "participate in the sessions and the work of the General Assembly in the capacity of observer." [10] The right of its representatives to admission to the United States as well as access to the U.N. was immediately challenged under American law. Judge Costantino rejected that challenge in *Anti–Defamation League of B'nai B'rith v. Kissinger,* Civil Action No. 74 C 1545 (E.D. N.Y. November 1, 1974). The court upheld the presence of a PLO representative in New York with access to the United Nations, albeit under certain entrance visa restrictions which limited PLO personnel movements to a radius of 25 miles from Columbus Circle in Manhattan. It stated from the bench:

> This problem must be viewed in the context of the special responsibility which the United Nations has to provide access to the United Nations under the Headquarters Agreement. It is important to note for the purposes of this case that a primary goal of the United Nations is to provide a forum where peaceful discussions may displace violence as a means of resolving disputed issues. At times our responsibility to the United Nations may require us to issue visas to persons who are objectionable to certain segments of our society.

*Id.,* transcript at 37, *partially excerpted in* Department of State, 1974 *Digest of United States Practice in International Law,* 27, 28.

Since 1974, the PLO has continued to function without interruption as a permanent observer and has maintained its Mission to the United Nations without trammel, largely because of the Headquarters Agreement, which we discuss below.

## II

### The Anti–Terrorism Act

In October 1986, members of Congress requested the United States Department of

---

**4.** The Democratic People's Republic of Korea, the Holy See, Monaco, the Republic of Korea, San Marino and Switzerland. *Permanent Missions No. 262* at 270–77.

**5.** The Asian–African Legal Consultative Committee, the Council for Mutual Assistance, the European Economic Community, the League of Arab States, the Organization of African Unity, and the Islamic Conference. *Permanent Missions No. 262* at 278–84.

**6.** The PLO and the South West African Peoples' Organization (SWAPO). *Permanent Missions No. 262* at 285–86.

**7.** Letter from Sec. of State George P. Shultz to Rep. Jack Kemp (October 16, 1986) ("the PLO

Observer Mission ... is in no sense accredited to the United States."), *reprinted in* 133 Cong. Rec. E 1,635–36 (daily ed. April 29, 1987); *accord* 1 *Restatement (Third) Foreign Relations Law of the United States* § 202, Reporters' Note 6 at 84 (1988).

**8.** Without accreditation, no diplomatic immunity ensues. *Cf. United States v. Kostadinov,* 734 F.2d 905 (2d Cir.1984), *cert. denied,* 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed.2d 184 (1985).

**9.** G.A.Res. 3237, 29 U.N. GAOR Supp. 31 (Agenda Item 108) 4, U.N.Doc. A/9631 (1974).

**10.** *Ibid.; see also* G.A.Res. 3236 and 3210, 29 U.N. GAOR Supp. 31 (Agenda Item 108) 3 & 4, U.N.Doc. A/9631 (1974).

State to close the PLO offices located in the United States.[11] That request proved unsuccessful, and proponents of the request introduced legislation with the explicit purpose of doing so.[12]

The result was the ATA, 22 U.S.C. §§ 5201–5203. It is of a unique nature. We have been unable to find any comparable statute in the long history of Congressional enactments. The PLO is stated to be "a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States." 22 U.S.C. § 5201(b). The ATA was added, without committee hearings,[13] as a rider to the Foreign Relations Authorization Act for Fiscal Years 1988–89, which provided funds for the operation of the State Department, including the operation of the United States Mission to the United Nations. Pub.L. 100–204 § 101, 101 Stat. 1331, 1335. The bill also authorized payments to the United Nations for maintenance and operation. *Id.* § 102(a)(1), 101 Stat. at 1336; *see also id.* § 143, 101 Stat. at 1386.

The ATA, which became effective on March 21, 1988,[14] forbids the establishment or maintenance of "an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by" the PLO, if the purpose is to further the PLO's interests. 22 U.S. C. § 5202(3). The ATA also forbids spending the PLO's funds or receiving anything of value except informational material from the PLO, with the same *mens rea* requirement. *Id.* §§ 5202(1) and (2).

Ten days before the effective date, the Attorney General wrote the Chief of the PLO Observer Mission to the United Nations that "maintaining a PLO Observer Mission to the United Nations will be unlawful," and advised him that upon failure of compliance, the Department of Justice would take action in federal court. This letter is reproduced in the record as item 28 of the Compendium prepared at the outset of this litigation pursuant to the court's April 21, 1988 request to counsel (attached as Appendix B). It is entitled "Compendium of the Legislative History of the Anti–Terrorism Act of 1987, Related Legislation, and Official Statements of the Department of Justice and the Department of State Regarding This Legislation." The documents in the compendium are of great interest.

The United States commenced this lawsuit the day the ATA took effect, seeking injunctive relief to accomplish the closure of the Mission. The United States Attorney for this District has personally repre-

---

**11.** *E.g.* 133 Cong.Rec. E 1,635 (daily ed. April 29, 1987) (letter from Rep. Jack Kemp to Sec. of State George P. Shultz (dated October 16, 1986)).

**12.** *Anti–PLO Terrorism Act of 1987,* H.R. 2211, 100th Cong., 1st Sess., *introduced in* 133 Cong. Rec. E 1,635 (daily ed. April 29, 1987). *Antiterrorism Act of 1987,* S. 1203 and H.R. 2548, 100th Cong., 1st Sess., *introduced in* 133 Cong.Rec. S 6,448 (daily ed. May 14, 1987) *and* H 4,047 (daily ed. May 28, 1987). *Terrorist Organization Exclusion Act of 1987,* H.R. 2587, 100th Cong., 1st Sess., *introduced in* 133 Cong.Rec. H 4,198 (daily ed. June 3, 1987).

**13.** The ATA, known as the Grassley Amendment after its sponsor Senator Grassley of Iowa, was added to the omnibus foreign relations spending bill on the floor of the Senate on October 8, 1987, despite the objections of several Senators. *See* 133 Cong.Rec. S 13,855 (daily ed. Oct. 8, 1987) (statement of Sen. Kassebaum) ("We do have hearings scheduled in the Foreign Rela-

tions Committee ... [and] it is important for us to have a hearing to explore the ramifications of the issues...."); *id.,* S 13,852 (statement of Sen. Bingaman) ("We need to further explore the issues raised by this amendment. It is an amendment that has not had any hearings, has not been considered in committee, and one that raises very serious issues of constitutional rights....").

The House version of the spending bill contained no equivalent provision, and the ATA was only briefly discussed during a joint conference which covered the entire spending bill. The House conferees rejected, 8–11, an exemption for the Mission, after which they acceded to the Senate's version. 133 Cong.Rec. S 18,193, ¶ 14 (daily ed. December 16, 1987). *See* 133 *id.* S 18,186, S 18,189 (statements of Sen. Helms); *see also* H.R.Conf.Rep. No. 475, 100th Cong., 1st Sess., 170–71 (1987).

**14.** Pub.L. 100–204, Title X, § 1005(a), 101 Stat. 1331, 1407, *set out in* 22 U.S.C.A. § 5201 note (West Supp.1988).

sented that no action would be taken to enforce the ATA pending resolution of the litigation in this court.

There are now four individual defendants in addition to the PLO itself.[15] Defendant Zuhdi Labib Terzi, who possesses an Algerian passport but whose citizenship is not divulged, has served as the Permanent Observer of the PLO to the United Nations since 1975. Defendant Riyad H. Mansour, a citizen of the United States, has been the Deputy Permanent Observer of the PLO to the United Nations since 1983. Defendant Nasser Al–Kidwa, a citizen of Iraq, is the Alternate Permanent Observer of the PLO to the United Nations. And defendant Veronica Kanaan Pugh, a citizen of Great Britain, is charged with administrative duties at the Observer Mission. These defendants contend that this court may not adjudicate the ATA's applicability to the Mission because such an adjudication would violate the United States' obligation under Section 21 of the Headquarters Agreement to arbitrate any dispute with the United Nations. Apart from that, they argue, application of the ATA to the PLO Mission would violate the United States' commitments under the Headquarters Agreement. They assert that the court lacks subject matter and personal jurisdiction over them and that they lack the capacity to be sued. Fed.R.Civ.P. 12(b)(1) and (2); 17(b). Defendant Riyad H. Mansour additionally moves to dismiss for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6).[16] Plaintiff, the United States, moves for summary judgment. Fed.R.Civ.P. 56.

### III

### Personal Jurisdiction over the Defendants

■ The PLO maintains an office in New York. The PLO pays for the maintenance and expenses of that office. It maintains a telephone listing in New York. The individuals employed at the PLO's Mission to the United Nations maintain a continuous presence in New York. There can be little question that it is within the bounds of fair play and substantial justice to hail them into court in New York. *International Shoe Co. v. Washington,* 326 U.S. 310, 320, 66 S.Ct. 154, 160, 90 L.Ed. 95 (1945). The limitations that the due process clause places on the exercise of personal jurisdiction are the only ones applicable to the statute in these circumstances. 22 U.S.C. § 5203(b). *Cf. United States v. Aluminum Co. of America,* 148 F.2d 416, 443–44 (2d Cir.1945) (L. Hand, J.). The PLO does not argue that it or its employees are the beneficiaries of any diplomatic immunity due to its presence as an invitee of the United Nations. We have no difficulty in concluding that the court has personal jurisdiction over the PLO and the individual defendants.

### IV

### The Duty to Arbitrate

Counsel for the PLO and for the United Nations and the Association of the Bar of the City of New York, as *amici curiae,* have suggested that the court defer to an advisory opinion of the International Court of Justice. *Applicability of the Obligation to Arbitrate Under Section 21 of the United Nations Headquarters Agreement of 26 June 1947,* 1988 I.C.J. 12 (April 26, 1988) (*U.N. v. U.S.*). That decision holds that the United States is bound by Section 21 of the Headquarters Agreement to submit to binding arbitration of a dispute precipitated by the passage of the ATA. Indeed, it is the PLO's position that this alleged duty to arbitrate deprives the court of subject matter jurisdiction over this litigation.

---

**15.** Two of the original six individual defendants were not served, and the action against them has been dismissed on consent without prejudice. Fed.R.Civ.P. 41(a)(1).

**16.** Mansour is also a plaintiff in the related case decided today. *Mendelsohn v. Meese,* 690 F.Supp. 1226 (S.D.N.Y.1988) (filed herewith). The court there addresses his claim that the ATA is an unconstitutional Bill of Attainder. *See also Mendelsohn v. Meese,* 686 F.Supp. 75 (S.D.N.Y.1988) (denying preliminary injunctive relief).

**1462**

■ In June 1947, the United States subscribed to the Headquarters Agreement, defining the privileges and immunities of the United Nations' Headquarters in New York City, thereby becoming the "Host Country"—a descriptive title that has followed it through many United Nations proceedings. The Headquarters Agreement was brought into effect under United States law, with an annex, by a Joint Resolution of Congress approved by the President on August 4, 1947.[17] The PLO rests its argument, as do the *amici*, on Section 21(a) of the Headquarters Agreement, which provides for arbitration in the case of any dispute between the United Nations and the United States concerning the interpretation or application of the Headquarters Agreement. Because interpretation of the ATA requires an interpretation of the Headquarters Agreement, they argue, this court must await the decision of an arbitral tribunal yet to be appointed before making its decision.

■ Section 21(a) of the Headquarters Agreement provides, in part:

> "Any dispute *between the United Nations and the United States* concerning the interpretation or application of this agreement or of any supplemental agreement, which is not settled by negotiation or other agreed mode of settlement, shall be referred for final decision to a tribunal of three arbitrators...."

61 Stat. at 764 (22 U.S.C. § 287 note) (emphasis supplied). Because these proceedings are not in any way directed to settling any dispute, ripe or not, between the United Nations and the United States, Section 21, is, by its terms, inapplicable.[18] The fact that the Headquarters Agreement was adopted by a majority of both Houses of Congress and approved by the President, see 61 Stat. at 768, might lead to the conclusion that it provides a rule of decision requiring arbitration any time the interpretation of the Headquarters Agreement is at issue in the United States Courts. That conclusion would be wrong for two reasons.

First, this court cannot direct the United States to submit to arbitration without exceeding the scope of its Article III powers. What sets this case apart from the usual situation in which two parties have agreed to binding arbitration for the settlement of any future disputes, requiring the court to stay its proceedings, *cf.* 9 U.S.C. § 3 (1982),[19] is that we are here involved with matters of international policy. This is an area in which the courts are generally unable to participate. These questions do not lend themselves to resolution by adjudication under our jurisprudence. *See generally Baker v. Carr,* 369 U.S. 186, 211–13, 82 S.Ct. 691, 707–08, 7 L.Ed.2d 663 (1962). The restrictions imposed upon the courts forbidding them to resolve such questions (often termed "political questions") derive not only from the limitations which inhere in the judicial process but also from those imposed by Article III of the Constitution. *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803) (Marshall, C.J.) ("The province of the court is, solely, to decide on the right of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion. Questions in their nature political, or which are, by the constitution and laws, submitted to the executive can never be made in this Court."). The decision in *Marbury* has never been disturbed.

---

**17.** S.J.Res. 144, 61 Stat. 756 (22 U.S.C. § 287 note); *see* n. 2, *supra. See also* 1 *Foreign Relations of the United States 1947* 42–46 (1973).

**18.** The United Nations has explicitly refrained from becoming a party to this litigation. The International Court of Justice makes a persuasive statement that the proceedings before this court "cannot be an 'agreed mode of settlement' within the meaning of section 21 of the Headquarters Agreement. The purpose of these proceedings is to enforce the Anti–Terrorism

Act of 1987; it is not directed to settling the [alleged] dispute, concerning the application of the Headquarters Agreement." *U.N. v. U.S., supra,* 1988 I.C.J. 12, ¶ 14, at 34.

**19.** The Federal Arbitration Act itself, 9 U.S.C. §§ 1–14 (1982), is applicable only to "a written agreement evidencing a transaction involving commerce." *Id.* § 2; *Bernhardt v. Polygraphic Co. of America,* 350 U.S. 198, 200–01, 76 S.Ct. 273, 275, 100 L.Ed. 199 (1956).

The conduct of the foreign relations of our Government is committed by the Constitution to the executive and legislative—the "political"—departments of the government. As the Supreme Court noted in *Baker v. Carr, supra,* 369 U.S. at 211, 82 S.Ct. at 707, not all questions touching upon international relations are automatically political questions. Nonetheless, were the court to order the United States to submit to arbitration, it would violate several of the tenets to which the Supreme Court gave voice in *Baker v. Carr, supra,* 369 U.S. at 217, 82 S.Ct. at 710.[20] Resolution of the question whether the United States will arbitrate requires "an initial policy determination of a kind clearly for nonjudicial discretion;" deciding whether the United States will or ought to submit to arbitration, in the face of a determination not to do so by the executive,[21] would be impossible without the court "expressing lack of the respect due coordinate branches of government;" and such a decision would raise not only the "potentiality" but the reality of "embarrassment from multifarious pronouncements by various departments on one question." It is for these reasons that the ultimate decision as to how the United States should honor its treaty obligations with the international community is one which has, for at least one hundred years, been left to the executive to decide. *Goldwater v. Carter,* 444 U.S. 996, 996–97, 100 S.Ct. 533, 533, 62 L.Ed.2d 428 (1979) (vacating, with instructions to dismiss, an attack on the President's action in terminating a treaty with

Taiwan); *Clark v. Allen,* 331 U.S. 503, 509, 67 S.Ct. 1431, 1435, 91 L.Ed. 1633 (1947) ("President and Senate may denounce a treaty and thus terminate its life") (*quoting Techt v. Hughes,* 229 N.Y. 222, 243, 128 N.E. 185 (Cardozo, J.), *cert. denied,* 254 U.S. 643, 41 S.Ct. 14, 65 L.Ed. 454 (1920)); *Oetjen v. Central Leather Co.,* 246 U.S. 297, 302, 38 S.Ct. 309, 310, 62 L.Ed. 726 (1918) (redress for violation of international accord must be sought via executive); *Chae Chan Ping v. United States (The Chinese Exclusion Case),* 130 U.S. 581, 602, 9 S.Ct. 623, 628, 32 L.Ed. 1068 ("the question whether our government is justified in disregarding its engagements with another nation is not one for the determination of the courts") (1889); *accord Whitney v. Robertson,* 124 U.S. 190, 194–95, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888). Consequently the question whether the United States should submit to the jurisdiction of an international tribunal is a question of policy not for the courts but for the political branches to decide.[22]

Section 21 of the Headquarters Agreement cannot provide a rule of decision regarding the interpretation of that agreement for another reason: treating it as doing so would require the courts to refrain from undertaking their constitutionally mandated function. The task of the court in this case is to interpret the ATA in resolving this dispute between numerous parties and the United States. Interpretation of the ATA, as a matter of domestic law, falls to the United States courts. In

---

**20.** The same is true of the suggestion of *amicus,* the Association of the Bar of the City of New York, that this court decline to exercise its equity jurisdiction before an arbitral tribunal has been convened. By doing so, the court could thereby place the executive department in an awkward position, leaving the impression that the court, rather than the executive, is making the determination of this issue of foreign policy. The court should not do by indirection what it cannot do directly.

**21.** It is important to note that we may not inquire into the executive's reasons for refraining from arbitration, and in fact those reasons are not before us. *See* Press Conference, Assistant Attorney General Charles Cooper, 16 (March 11, 1988) ("I would not describe any of the

deliberations that went into that decision."); *see also* Letter of Assistant Attorney General John R. Bolton to Judge Edmund L. Palmieri (May 12, 1988) (docketed at the request of government counsel in 88 Civ. 1962 and 88 Civ. 2005) ("arbitration would not be appropriate or timely").

**22.** The political question doctrine is inapplicable to the court's duty to interpret the Headquarters Agreement and the ATA. *Japan Whaling Association v. American Cetacean Society,* 478 U.S. 221, 230, 106 S.Ct. 2860, 2866, 92 L.Ed. 2d 166 (1986). We are interpreting the Agreement, but are unwilling to expand the reach of its arbitration clause to a point which would be inconsistent with the limitations placed upon us by the Constitution.

interpreting the ATA, the effect of the United States' international obligations— the United Nations Charter and the Headquarters Agreement in particular—must be considered. As a matter of domestic law, the interpretation of these international obligations and their reconciliation, if possible, with the ATA is for the courts. It is, as Chief Justice Marshall said, "emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). That duty will not be resolved without independent adjudication of the effect of the ATA on the Headquarters Agreement. Awaiting the decision of an arbitral tribunal would be a repudiation of that duty.

Interpreting Section 21 as a rule of decision would, at a minimum, raise serious constitutional questions. We do not interpret it in that manner. *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500–01, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979). It would not be consonant with the court's duties for it to await the interpretation of the Headquarters Agreement by an arbitral tribunal, not yet constituted, before undertaking the limited task of interpreting the ATA with a view to resolving the actual dispute before it.

In view of the foregoing, the court finds that it is not deprived of subject matter jurisdiction by Section 21 of the Headquarters Agreement and that any interpretation of the Headquarters Agreement incident to an interpretation of the ATA must be done by the court.

## V

### *The Anti–Terrorism Act and the Headquarters Agreement*

If the ATA were construed as the government suggests, it would be tantamount to a direction to the PLO Observer Mission at the United Nations that it close its doors and cease its operations *instanter*. Such an interpretation would fly in the face of the Headquarters Agreement, a prior treaty between the United Nations and the United States, and would abruptly terminate the functions the Mission has performed for many years. This conflict requires the court to seek out a reconciliation between the two.

Under our constitutional system, statutes and treaties are both the supreme law of the land, and the Constitution sets forth no order of precedence to differentiate between them. U.S. Const. art. VI, cl. 2. Wherever possible, both are to be given effect. *E.g. Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 252, 104 S.Ct. 1776, 1783, 80 L.Ed.2d 273 (1984); *Weinberger v. Rossi*, 456 U.S. 25, 32, 102 S.Ct. 1510, 1516, 71 L.Ed.2d 715 (1982); *Washington v. Washington State Commercial Passenger Fishing Vessel Association*, 443 U.S. 658, 690, 99 S.Ct. 3055, 3077, 61 L.Ed.2d 823, *modified*, 444 U.S. 816, 100 S.Ct. 34, 62 L.Ed.2d 24 (1979); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10, 21–22, 83 S.Ct. 671, 677–78, 9 L.Ed.2d 547 (1963); *Clark v. Allen, supra,* 331 U.S. at 510–11, 67 S.Ct. at 1435–36; *Chew Heong v. United States*, 112 U.S. 536, 550, 5 S.Ct. 255, 260, 28 L.Ed. 770 (1884). Only where a treaty is irreconcilable with a later enacted statute and Congress has clearly evinced an intent to supersede a treaty by enacting a statute does the later enacted statute take precedence. *E.g. The Chinese Exclusion Case, supra,* 130 U.S. at 599–602, 9 S.Ct. at 627–28 (finding clear intent to supersede); *Edye v. Robertson (The Head Money Cases)*, 112 U.S. 580, 597–99, 5 S.Ct. 247, 253–54, 28 L.Ed. 798 (1884) (same, decided on the same day as *Chew Heong, supra,* which found no such intent); *South African Airways v. Dole*, 817 F.2d 119, 121, 125–26 (D.C.Cir.) (Anti–Apartheid Act of 1986, directing the Secretary of State to "terminate the Agreement Between the United States of America and the Government of the Union of South Africa" irreconcilable with that treaty), *cert. denied,* — U.S. —, 108 S.Ct. 229, 98 L.Ed.2d 188 (October 13, 1987); *Diggs v. Shultz*, 470 F.2d 461, 466 (D.C.Cir.1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973). *Compare Menominee Tribe of Indians v. United States*, 391 U.S. 404, 413, 88 S.Ct. 1705, 1711, 20 L.Ed.2d 697 (1968)

(finding no clear intent to abrogate treaty); *McCulloch v. Sociedad de Marineros, supra,* 372 U.S. at 21–22, 83 S.Ct. at 677–78 (same); *Cook v. United States,* 288 U.S. 102, 119–20, 53 S.Ct. 305, 311, 77 L.Ed. 641 (1933) (same).

■ The long standing and well-established position of the Mission at the United Nations, sustained by international agreement, when considered along with the text of the ATA and its legislative history, fails to disclose any clear legislative intent that Congress was directing the Attorney General, the State Department or this Court to act in contravention of the Headquarters Agreement. This court acknowledges the validity of the government's position that Congress *has the power* to enact statutes abrogating prior treaties or international obligations entered into by the United States. *Whitney v. Robertson, supra,* 124 U.S. at 193–95, 8 S.Ct. at 457–58; *The Head Money Cases, supra,* 112 U.S. at 597–99, 5 S.Ct. at 253–54. However, unless this power is clearly and unequivocally exercised, this court is under a duty to interpret statutes in a manner consonant with existing treaty obligations. This is a rule of statutory construction sustained by an unbroken line of authority for over a century and a half. Recently, the Supreme Court articulated it in *Weinberger v. Rossi, supra,* 456 U.S. at 32, 102 S.Ct. at 1516:

> It has been maxim of statutory construction since the decision in *Murray v. The Charming Betsy,* 6 U.S. (2 Cranch) 64, 118 [2 L.Ed. 208] (1804), that "an act of Congress ought never to be construed to violate the law of nations, if any other possible construction remains...."

*Accord Trans World Airlines, supra,* 466 U.S. at 252, 104 S.Ct. at 1783; *Washington v. Fishing Vessel Association, supra,* 443 U.S. at 690, 99 S.Ct. at 3077; *Menominee Tribe of Indians, supra,* 391 U.S. at 412–13, 88 S.Ct. at 1711; *McCulloch v. Sociedad de Marineros, supra,* 372 U.S. at 21–22, 83 S.Ct. at 677–78; *Lauritzen v. Larsen,* 345 U.S. 571, 578, 73 S.Ct. 921, 926, 97 L.Ed. 1254 (1953); *Clark v. Allen, supra,*

341 U.S. at 510, 67 S.Ct. at 1435; *Pigeon River Improvement, Slide & Boom Co. v. Charles W. Cox, Ltd.,* 291 U.S. 138, 160, 54 S.Ct. 361, 367, 78 L.Ed. 695 (1934); *Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 132, 132, 43 S.Ct. 504, 510, 510, 67 L.Ed. 894 (1923) (Sutherland, J., dissenting); *Chew Heong, supra,* 112 U.S. at 549, 5 S.Ct. at 260 (1884).

The American Law Institute's recently revised *Restatement (Third) Foreign Relations Law of the United States* (1988) reflects this unbroken line of authority:

> § 115. Inconsistency Between International Law or Agreement and Domestic Law: Law of the United States.
>
> (1)(a) An Act of Congress supersedes an earlier rule of international law or a provision of an international agreement as law of the United States *if the purpose of the act to supersede the earlier rule or provision is clear* and if the act and the earlier rule or provision cannot be fairly reconciled.

(emphasis supplied).

We believe the ATA and the Headquarters Agreement cannot be reconciled except by finding the ATA inapplicable to the PLO Observer Mission.

### A. The Obligations of the United States under the Headquarters Agreement.

■ The obligation of the United States to allow transit, entry and access stems not only from the language of the Headquarters Agreement but also from forty years of practice under it. Section 11 of the Headquarters Agreement reads, in part,

> The federal, state or local authorities of the United States shall not impose any impediments to transit to or from the headquarters district of: (1) representatives of Members ..., (5) other persons invited to the headquarters district by the United Nations ... on official business.

61 Stat. at 761 (22 U.S.C. § 287 note).[23] These rights could not be effectively exer-

---

**23.** Section 12 requires that the provisions of Section 11 be applicable "irrespective of the

relations existing between the Governments of the persons referred to in that Section and the

cised without the use of offices. The ability to effectively organize and carry out one's work, especially as a liaison to an international organization, would not be possible otherwise. It is particularly significant that Section 13 limits the application of United States law not only with respect to the entry of aliens, but also their residence. The Headquarters Agreement thus contemplates a continuity limited to official United Nations functions and is entirely consistent with the maintenance of missions to the United Nations. The exemptions of Section 13 are not limited to members, but extend to invitees as well.

In addition, there can be no dispute that over the forty years since the United States entered into the Headquarters Agreement it has taken a number of actions consistent with its recognition of a duty to refrain from impeding the functions of observer missions to the United Nations. It has, since the early days of the U.N.'s presence in New York, acquiesced in the presence of observer missions to the U.N. in New York. *See Permanent Missions: Report of the Secretary–General, supra,* at 17, ¶ 14 (1949).

After the United Nations invited the PLO to participate as a permanent observer, the Department of State took the position that it was required to provide access to the U.N. for the PLO. 1974 *Digest of United States Practice in International Law* 27–29; 1976 *Digest of United States Practice in International Law* 74–75. The State Department at no time disputed the notion that the rights of entry, access and residence guaranteed to invitees include the right to maintain offices.

The view that under the Headquarters Agreement the United States must allow PLO representatives access to and presence in the vicinity of the United Nations was adopted by the court in *Anti–Defamation League of B'nai B'rith v. Kis-*

*singer, supra; see also Harvard Law School Forum v. Shultz,* 633 F.Supp. 525, 526–27 (D.Mass.1986). The United States has, for fourteen years, acted in a manner consistent with a recognition of the PLO's rights in the Headquarters Agreement. This course of conduct under the Headquarters Agreement is important evidence of its meaning. *O'Connor v. United States,* 479 U.S. 27, 33, 107 S.Ct. 347, 351, 93 L.Ed.2d 206, 214 (1986).

Throughout 1987, when Congress was considering the ATA, the Department of State elaborated its view that the Headquarters Agreement contained such a requirement. Perhaps the most unequivocal elaboration of the State Department's interpretation was the letter of J. Edward Fox, Assistant Secretary for Legislative Affairs, to Dante Fascell, Chairman of the House Committee on Foreign Affairs (November 5, 1987):

> The United States has acknowledged that [the invitations to the PLO to become a permanent observer] give rise to United States obligations to accord PLO observers the rights set forth in sections 11–13 of the Headquarters Agreement. *See, e.g.,* 1976 *Digest of United States Practice in International Law* 74–75. The proposed legislation would effectively require the United States to deny PLO observers the entry, transit, and residence rights required by sections 11–13 and, as a later enacted statute, would supersede the Headquarters Agreement in this regard as a matter of domestic law.
>
> The proposed legislation would also.... break a 40–year practice regarding observer missions by nations hosting U.N. bodies and could legitimately be viewed as inconsistent with our responsibilities under sections 11–13 of the United Nations Headquarters Agreement. * * * [24]

Government of the United States." 61 Stat. at 761 (22 U.S.C. § 287 note).

Section 13 limits the applicability of the United States laws and regulations regarding the entry and residence of aliens, when applied to those affiliated with the United Nations by vir-

tue of Section 11. *Id.* at 761–62 (22 U.S.C. § 287 note).

**24.** This letter was reproduced as item 33 of the Compendium submitted by the parties to the court. *See also* Letter from Sec. of State George P. Shultz to Sens. Robert J. Dole, Charles E. Grassley, Claiborne Pell and Rep. Jack F. Kemp

Shortly before the adoption of the ATA, during consideration of a report of the Committee on Relations with the Host Country by the General Assembly of the United Nations, the United States' representative noted "that the United States Secretary of State had stated that the closing of the mission would constitute a violation of United States obligation under the Headquarters Agreement." U.N. Doc A/C.6/42/SR.58 (November 25, 1987) at ¶ 3. He had previously stated that "closing the mission, in our view, and I emphasize this is the executive branch, is not consistent with our international legal obligations under the Headquarters Agreement." Partial Transcript of the 126th Meeting of the Committee on Relations with Host Country, at 4 (October 14, 1987). And the day after the ATA was passed, State Department spokeswoman Phyllis Oakley told reporters that the ATA, "if implemented, would be contrary to our international legal obligations under the Headquarters Agreement, [so the administration intends] ... to engage in consultations with the Congress in an effort to resolve this matter." Department of State Daily Press Briefing at 8 (December 23, 1987).[25]

It seemed clear to those in the executive branch that closing the PLO mission would be a departure from the United States' practice in regard to observer missions, and they made their views known to members of Congress who were instrumental in the

passage of the ATA. In addition, United States representatives to the United Nations made repeated efforts to allay the concerns of the U.N. Secretariat by reiterating and reaffirming the obligations of the United States under the Headquarters Agreement.[26] A chronological record of their efforts is set forth in the advisory opinion of the International Court of Justice, *U.N. v. U.S.*, *supra*, 1988 I.C.J. 12, ¶¶ 11–22, at 16–22 (April 26, 1988). The U.N. Secretariat considered it necessary to request that opinion in order to protect what it considered to be the U.N.'s rights under the Headquarters Agreement.[27] The United Nations' position that the Headquarters Agreement applies to the PLO Mission is not new. 1979 U.N.Jurid.Y.B. 169–70; *see* 1980 U.N.Jurid.Y.B. 188 ¶ 3.

■ "Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight." *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85, 102 S.Ct. 2374, 2379, 72 L.Ed.2d 765 (1982). The interpretive statements of the United Nations also carry some weight, especially because they are in harmony with the interpretation given to the Headquarters Agreement by the Department of State. *O'Connor*, *supra*, 479 U.S. at 32–33, 107 S.Ct. at 351, 96 L.Ed.2d at 214.

(July 31, 1987) ("this would be seen as a violation of a U.S. treaty obligation"); Letter from Sec. Shultz to Sen. Dole (January 29, 1987), *reprinted in*, 133 Cong.Rec. S 6,449 (daily ed. May 14, 1987) ("while we are therefore under an obligation to permit PLO Observer Mission Personnel to enter and remain in the United States to carry out their official functions at U.N. headquarters, we retain the right to deny entry to, or expel, any individual PLO representative directly implicated in terrorist acts"); Letter from Sec. Shultz to Rep. Kemp (November 12, 1986), *reprinted in*, 133 Cong.Rec. E 1,635, 1,636 (daily ed. April 29, 1987) (same language).

**25.** This court has no information concerning the nature or content of these consultations, beyond the fact that the Department of Justice and the Department of State both appear to support current efforts to repeal the ATA. *See* H.R. 4078, 100th Cong., 2d Sess., *introduced in* 134 Cong.Rec. H 696 (daily ed. March 3, 1988)

(statement of Rep. Crockett); Letter from Acting Assist. Atty. Gen. Thomas M. Boyd to Rep. Dante B. Fascell (May 10, 1988) (expressing reservations about H.R. 4078, but supporting it, with modifications); Letter from Assist. Sec. of State J. Edward Fox to Rep. Fascell (April 29, 1988) (same).

**26.** *See* Letter from Vernon A. Walters, U.S. Ambassador to the U.N., to U.N. Secretary–General Javier Perez de Cuellar (October 27, 1987); Letter from Herbert S. Okun to Secretary General Perez de Cuellar (January 5, 1988).

**27.** In addition, the U.N. General Assembly has, on several occasions, reaffirmed its position that the PLO Mission is covered by the provisions of the Headquarters Agreement. G.A.Res. 42/230 (Agenda item 136) (March 23, 1988); G.A.Res. 42/229A (Agenda item 136) (March 2, 1988); *see also* G.A.Res. 42/232 (Agenda item 136) (May 18, 1988).

Thus the language, application and interpretation of the Headquarters Agreement lead us to the conclusion that it requires the United States to refrain from interference with the PLO Observer Mission in the discharge of its functions at the United Nations.

## B. Reconciliation of the ATA and the Headquarters Agreement.

The lengths to which our courts have sometimes gone in construing domestic statutes so as to avoid conflict with international agreements are suggested by a passage from Justice Field's dissent in *Chew Heong, supra,* 112 U.S. at 560, 560–61, 67 S.Ct. at 267, 267 (1884):

I am unable to agree with my associates in their construction of the act ... restricting the immigration into this country of Chinese laborers. That construction appears to me to be in conflict with the language of that act, and to require the elimination of entire clauses and the interpolation of new ones. It renders nugatory whole provisions which were inserted with sedulous care. The change thus produced in the operation of the act is justified on the theory that to give it any other construction would bring it into conflict with the treaty; and that we are not at liberty to suppose that Congress intended by its legislation to disregard any treaty stipulations.

*Chew Heong* concerned the interplay of legislation regarding Chinese laborers with treaties on the same subject. During the passage of the statute at issue in *Chew Heong,* "it was objected to the legislation sought that the treaty of 1868 stood in the way, and that while it remained unmodified, such legislation would be a breach of faith to China...." *Id.* at 569, 67 S.Ct. at 272. In spite of that, and over Justice Field's dissent, the Court, in Justice Field's words, "narrow[ed] the meaning of the act so as measurably to frustrate its intended operation." Four years after the decision in *Chew Heong,* Congress amended the act in question to nullify that decision. Ch. 1064, 25 Stat. 504. With the amended statute, there could be no question as to Congress' intent to supersede the treaties, and it was the later enacted statute which took precedence. *The Chinese Exclusion Case, supra,* 130 U.S. at 598–99, 9 S.Ct. at 627 (1889).

The principles enunciated and applied in *Chew Heong* and its progeny, *e.g. Trans World Airlines, supra,* 466 U.S. at 252, 104 S.Ct. at 1783; *Weinberger v. Rossi, supra,* 456 U.S. at 32, 102 S.Ct. at 1516; *Menominee Tribe of Indians, supra,* 391 U.S. at 413, 88 S.Ct. at 1711; *McCulloch v. Sociedad de Marineros, supra,* 372 U.S. at 21–22, 83 S.Ct. at 677–78; *Pigeon River, supra,* 291 U.S. at 160, 67 S.Ct. at 367; *Cook v. United States, supra,* 288 U.S. at 119–20, 53 S.Ct. at 311, require the clearest of expressions on the part of Congress. We are constrained by these decisions to stress the lack of clarity in Congress' action in this instance. Congress' failure to speak with one clear voice on this subject requires us to interpret the ATA as inapplicable to the Headquarters Agreement. This is so, in short, for the reasons which follow.

First, neither the Mission nor the Headquarters Agreement is mentioned in the ATA itself. Such an inclusion would have left no doubt as to Congress' intent on a matter which had been raised repeatedly with respect to this act, and its absence here reflects equivocation and avoidance, leaving the court without clear interpretive guidance in the language of the act. Second, while the section of the ATA prohibiting the maintenance of an office applies "notwithstanding any provision of law to the contrary," 22 U.S.C. § 5202(3), it does not purport to apply notwithstanding any *treaty.* The absence of that interpretive instruction is especially relevant because elsewhere in the same legislation Congress expressly referred to "United States law (including any treaty)." 101 Stat. at 1343. Thus Congress failed, in the text of the ATA, to provide guidance for the interpretation of the act, where it became repeatedly apparent before its passage that the prospect of an interpretive problem was inevitable. Third, no member of Congress expressed a clear and unequivocal intent to supersede the Headquarters

Agreement by passage of the ATA. In contrast, most who addressed the subject of conflict denied that there would be a conflict: in their view, the Headquarters Agreement did not provide the PLO with any right to maintain an office. Here again, Congress provided no guidance for the interpretation of the ATA in the event of a conflict which was clearly foreseeable. And Senator Claiborne Pell, Chairman of the Senate Foreign Relations Committee, who voted for the bill, raised the possibility that the Headquarters Agreement would take precedence over the ATA in the event of a conflict between the two.[28] His suggestion was neither opposed nor debated, even though it came in the final minutes before passage of the ATA.

A more complete explanation begins, of course, with the statute's language. The ATA reads, in part:

It shall be unlawful, if the purpose be to further the interests of the PLO * * *—

* * * * * *

(3) notwithstanding any provision of law to the contrary, to establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the PLO * * *.

22 U.S.C. § 5202(3).

The Permanent Observer Mission to the United Nations is nowhere mentioned *in haec verba* in this act, as we have already observed. It is nevertheless contended by the United States that the foregoing provision requires the closing of the Mission, and this in spite of possibly inconsistent international obligations. According to the government, the act is so clear that this possibility is nonexistent. The government argues that its position is supported by the provision that the ATA would take effect "notwithstanding any provision of law to the contrary," 22 U.S.C. § 5202(3), suggesting that Congress thereby swept away any inconsistent international obligations of the United States. In effect, the government urges literal application of the maxim that in the event of conflict between two laws, the one of later date will prevail: *leges posteriores priores contrarias abrogant.*

We cannot agree. The proponents of the ATA were, at an early stage and throughout its consideration, forewarned that the ATA would present a potential conflict with the Headquarters Agreement.[29] It was especially important in those circumstances for Congress to give clear, indeed unequivocal guidance, as to how an interpreter of the ATA was to resolve the conflict. Yet there was no reference to the Mission in the text of the ATA, despite extensive discussion of the Mission in the floor debates. Nor was there reference to the Headquarters Agreement, or to any treaty, in the ATA or in its "notwithstanding" clause, despite the textual expression of intent to supersede treaty obligations in other sections of the Foreign Relations Authorization Act, of which the ATA formed a part.[30] Thus Congress failed to provide unequivocal interpretive guidance in the text of the ATA, leaving open the possibility that the ATA could be viewed as a law of general application and enforced as such, without encroaching on the position of the Mission at the United Nations.

That interpretation would present no inconsistency with what little legislative history exists. There were conflicting voices

---

28. 133 Cong.Rec. S 18,185–86 (daily ed. December 16, 1987).

29. *See* pp. 23–25 & nn. 24 & 25, *supra. See also* Transcript of Joint Conference on H.R. 1777, p. 208 (December 3, 1987) (statement of State Department representative Jamie Selby: "it is a legal obligation based on practice in interpreting a treaty"); 133 Cong.Rec. H 11,224 (daily ed. December 10, 1987) (statement of Rep. Crockett) (ATA would place United States "in violation of our treaty obligations").

30. *E.g.* Pub.L. 100–204 § 215(a), 101 Stat. 1331, 1343 (*adding* 22 U.S.C. § 4315(a)) ("A foreign mission may not allow an unaffiliated alien the use of any premise of that foreign mission which is inviolable under United States law (*including any treaty*) for any purpose which is incompatible with its status as a foreign mission including use as a residence.") (emphasis supplied); *see also id.* § 806(d)(1)(B), 101 Stat. at 1398 (*adding* 19 U.S.C. § 2492(d)(1)(B)) (abrogating "agreements," necessarily international).

both in Congress and in the executive branch before the enactment of the ATA. Indeed, there is only one matter with respect to which there was unanimity—the condemnation of terrorism. This, however, is extraneous to the legal issues involved here. At oral argument, the United States Attorney conceded that there was no evidence before the court that the Mission had misused its position at the United Nations or engaged in any covert actions in furtherance of terrorism.[31] If the PLO is benefiting from operating in the United States, as the ATA implies, the enforcement of its provisions outside the context of the United Nations can effectively curtail that benefit.

The record contains voices of congressmen and senators forceful in their condemnation of terrorism and of the PLO and supporting the notion that the legislation would close the mission.[32] There are other voices, less certain of the validity of the proposed congressional action and preoccupied by problems of constitutional dimension.[33] And there are voices of Congressmen uncertain of the legal issues presented but desirous nonetheless of making a "political statement." [34] During the discussions which preceded and followed the passage of the ATA, the Secretary of State [35] and the Legal Adviser to the Department of State,[36] a former member of this Court, voiced their opinions to the effect that the ATA presented a conflict with the Headquarters Agreement.

Yet no member of Congress, at any point, explicitly stated that the ATA was intended to override any international obligation of the United States.

The only debate on this issue focused not on whether the ATA would do so, but on whether the United States in fact had an obligation to provide access to the PLO. Indeed, every proponent of the ATA who spoke to the matter argued that the United States did not have such an obligation. For instance, Senator Grassley, after arguing that the United States had no obligation relating to the PLO Mission under the Headquarters Agreement, noted in passing that Congress had the *power* to modify treaty obligations. But even there, Senator Grassley did not argue that the ATA would supersede the Headquarters Agreement in the event of a conflict. 133 Cong.Rec. S 15,621–22 (daily ed. November 3, 1987). This disinclination to face the prospect of an actual conflict was again manifest two weeks later, when Senator Grassley explained, "as I detailed earlier ..., the United States has *no international legal obligation* that would preclude it from closing the PLO Observer Mission." 133 Cong.Rec. S 16,505 (daily ed. November 20, 1987) (emphasis supplied). As the Congressional Record reveals, at the time

---

**31.** Transcript of oral argument, p. 18 (June 8, 1988). This concession disposes of the suggestion that the United States' Security Reservation to the Headquarters Agreement, Annex 2, § 6, 61 Stat. at 766, 767–681 (22 U.S.C. § 287 note), serves as a justification for the ATA.

**32.** *E.g.* 133 Cong.Rec. H 11,684–85 (daily ed. December 18, 1987) (statement of Rep. Burton); 133 Cong.Rec. S 15,621 (daily ed. November 3, 1987) (statement of Sen. Grassley); 133 Cong. Rec. S 9,627 (daily ed. July 10, 1987) (statement of Sen. Grassley); 133 Cong.Rec. E 2,249 (daily ed. June 4, 1987) (statement of Rep. Gallegly); 133 Cong.Rec. H 4,047 (daily ed. May 28, 1987) (statement of Rep. Herger); 133 Cong.Rec. S 6,449 (daily ed. May 14, 1987) (statement of Sen. D'Amato); *id.*, S 6448 (statement of Senator Dole); 133 Cong.Rec. E 1,635 (daily ed. April 29, 1987) (statement of Rep. Kemp).

**33.** 133 Cong.Rec. H 12,224 (daily ed. December 10, 1987) (statement of Rep. Crockett); 133

Cong.Rec. S 13,852 (daily ed. October 8, 1987) (statement of Sen. Bingaman); 133 Cong.Rec. E 2,895 (daily ed. July 14, 1987) (statement of Rep. Bonior).

**34.** Transcript of Joint Conference on H.R. 1777, pp. 210–11 (December 3, 1987) (statements of Reps. Mica and Kostmayer).

**35.** "As far as the closure of the PLO Observer Mission is concerned, this would be seen as a violation of a United States treaty obligation under the United Nations Headquarters Agreement." Letter from Sec. of State George P. Shultz to unnamed Senators and Congressmen (July 31, 1987), *partially reprinted in* 133 Cong. Rec. S 16,605 (daily ed. November 20, 1987) (statement of Sen. Grassley).

**36.** Hon. Abraham Sofaer: "It is our judgment that the Headquarters Agreement as interpreted and applied would be violated." *New York Times,* January 13, 1988 at A3.

of the ATA's passage (on December 15 in the House and December 16 in the Senate), its proponents were operating under a misapprehension of what the United States' treaty obligation entailed. 133 Cong.Rec. S 18,190 (daily ed. December 16, 1987) (statement of Sen. Helms) (closing the Mission would be "entirely within our Nation's obligations under international law"); 133 Cong.Rec. H 11,425 (daily ed. December 15, 1988) (statement of Rep. Burton) (observer missions have "no—zero—rights in the Headquarters Agreement").[37]

In sum, the language of the Headquarters Agreement, the longstanding practice under it, and the interpretation given it by the parties to it leave no doubt that it places an obligation upon the United States to refrain from impairing the function of the PLO Observer Mission to the United Nations. The ATA and its legislative history do not manifest Congress' intent to abrogate this obligation. We are therefore constrained to interpret the ATA as failing to supersede the Headquarters Agreement and inapplicable to the Mission.

### C. The Continued Viability of the ATA.

 We have interpreted the ATA as inapplicable to the PLO Mission to the United Nations. The statute remains a valid enactment of general application. It is a wide gauged restriction of PLO activity within the United States and, depending on the nature of its enforcement, could effectively curtail any PLO activities in the United States, aside from the Mission to the United Nations. We do not accept the suggestion of counsel that the ATA be struck down. The federal courts are constrained to avoid a decision regarding unconstitutionality except where strictly necessary. *Rescue Army v. Municipal Court of the City of Los Angeles*, 331 U.S. 549, 568–72,

67 S.Ct. 1409, 1419–21, 91 L.Ed. 1666 (1947). In view of our construction of the statute, this can be fairly avoided in this instance. The extent to which the First Amendment to the Constitution and the Bill of Attainder Clause, Art. I, § 9, cl. 3, guide our interpretation of the ATA is addressed in *Mendelsohn v. Meese, post.*

## VI

### Conclusions

The Anti–Terrorism Act does not require the closure of the PLO Permanent Observer Mission to the United Nations nor do the act's provisions impair the continued exercise of its appropriate functions as a Permanent Observer at the United Nations. The PLO Mission to the United Nations is an invitee of the United Nations under the Headquarters Agreement and its status is protected by that agreement. The Headquarters Agreement remains a valid and outstanding treaty obligation of the United States. It has not been superseded by the Anti–Terrorism Act, which is a valid enactment of general application.

We express our thanks to the lawyers in this case, especially those appearing for *amici curiae*, for their professional dedication and their assistance to the court.

The motion of the defendants to dismiss for lack of personal jurisdiction is denied.

The motion of the defendants to dismiss for lack of subject matter jurisdiction is denied.

The motion of the defendants to dismiss for lack of capacity, which was not briefed, is denied.

Mansour's motion to dismiss for failure to state a claim upon which relief may be granted is treated, pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, as

---

**37.** *Accord* 133 Cong.Rec. H 8,790 (daily ed. October 20, 1987) (statement of Rep. Burton); 133 Cong.Rec. S 9,627–28 (daily ed. July 10, 1987) (statement of Sen. Grassley); 133 Cong.Rec. S 6,449–50 (daily ed. May 14, 1987) (statement of Sen. D'Amato); *id.* S 6,449 (statement of Sen. Dole).

Indeed, this misapprehension apparently has continued after the passage of the ATA and even during the pendency of this lawsuit. *E.g.* 134 Cong.Rec. S 3,113 (daily ed. March 25, 1988) (statement of Sen. D'Amato); 134 Cong.Rec. S 1,997 (daily ed. March 4, 1988) (statement of Sen. Grassley).

a motion for summary judgment, Fed.R. Civ.P. 56, and is granted.

The motion of the United States for summary judgment is denied, and summary judgment is entered for the defendants, dismissing this action with prejudice.

SO ORDERED.

## APPENDIX A

### TITLE 22, UNITED STATES CODE (FOREIGN RELATIONS)

### CHAPTER 61—ANTI–TERRORISM—PLO

### § 5201. Findings; determinations

#### (a) Findings

The Congress finds that—

(1) Middle East terrorism accounted for 60 percent of total international terrorism in 1985;

(2) the Palestine Liberation Organization (hereafter in this title referred to as the "PLO") was directly responsible for the murder of an American citizen on the Achille Lauro cruise liner in 1985, and a member of the PLO's Executive Committee is under indictment in the United States for the murder of that American Citizen;

(3) the head of the PLO has been implicated in the murder of a United States Ambassador overseas;

(4) the PLO and its constituent groups have taken credit for, and been implicated in, the murders of dozens of American citizens abroad;

(5) the PLO covenant specifically states that "armed struggle is the only way to liberate Palestine, thus it is an overall strategy, not merely a tactical phase";

(6) the PLO rededicated itself to the "continuing struggle in all its armed forms" at the Palestine National Council meeting in April 1987; and

(7) the Attorney General has stated that "various elements of the Palestine Liberation Organization and its allies and affiliates are in the thick of international terror".

#### (b) Determinations

Therefore, the Congress determines that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States.

### § 5202. Prohibitions regarding the PLO

It shall be unlawful, if the purpose be to further the interests of the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof, on or after [March 21, 1988]—

(1) to receive anything of value except informational material from the PLO or any of its constituent groups, any successor thereto, or any agents thereof; or

(2) to expend funds from the PLO or any of its constituent groups, any successor thereto, or any agents thereof; or

(3) notwithstanding any provision of law to the contrary, to establish or maintain an office, headquarters, premises or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof.

### § 5203. Enforcement

#### (a) Attorney General

The Attorney General shall take the necessary steps and institute the necessary legal action to effectuate the policies and provisions of this chapter.

#### (b) Relief

Any district court of the United States for a district in which a violation of this chapter occurs shall have authority, upon petition of relief by the Attorney General, to grant injunctive and such other equitable relief as it shall deem necessary to enforce the provisions of this chapter.

APPENDIX B

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

NEW YORK, NEW YORK 10007

CHAMBERS OF
EDMUND L. PALMIERI
DISTRICT JUDGE

April 21, 1988

TO ALL COUNSEL

Re: United States v. Palestine Liberation Organization, et al., 88 Civ. 1962 (ELP);
Mendelsohn, et al. v. Meese, 88 Civ. 2005 (ELP).

Dear Sirs:

With a view to expediting our respective tasks with regard to the ultimate disposition of this litigation, I would appreciate the submission of the following:

1. All official statements concerning the interpretation and constitutionality of the Anti–Terrorism Act of 1987, Title X of the Foreign Relations Authorization Act for Fiscal Years 1988–89 (Pub.L. 100–204, §§ 1001–1005; 101 Stat. 1331, 1406–07; 22 U.S.C.A. §§ 5201–5203 (West Supp.1988)) issued by the Department of State as well as the Department of Justice.

2. All available documentary evidence of congressional intent with respect to the Anti–Terrorism Act of 1987, Title X of the Foreign Relations Authorization Act for Fiscal Years 1988–89.

In order to obviate duplication of effort and to assure a full submission, I suggest that Government counsel assemble this material in the first instance and then make it available to defense counsel for inspection and possible supplementation before submitting it to the Court.

I understand that Assistant United States Attorney Richard Mark is now endeavoring to work out a briefing schedule with counsel. I expect to be advised of the results of his efforts in due course. Compliance with the request I make in this letter should not be delayed because of any briefing schedule, however, as the material I request would be useful to me in connection with my continuing study of these cases.

Very truly yours,
(s) Edmund L. Palmieri
Edmund L. Palmieri
United States District Judge

cc: Rudolph W. Giuliani, United States Attorney
Richard Mark, Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007
Ramsey Clark
36 East 12th Street
New York, New York 10003
Leonard B. Boudin
Rabinowitz, Boudin, Standard, Krinsky & Lieberman
740 Broadway at Astor Place
New York, New York 10003-9518
Keith Highet
Joseph D. Pizzurro
Curtis, Mallet–Prevost, Colt & Mosle
101 Park Avenue
New York, New York 10178-0061