(Slip Opinion)

# Statutory Restrictions on the PLO's Washington Office

The Anti-Terrorism Act of 1987 may not constitutionally bar the Palestine Liberation
Organization from maintaining its Washington, D.C. office and undertaking diplomatic
activities the Secretary of State wishes to authorize.

September 11, 2018

MEMORANDUM OPINION FOR THE LEGAL ADVISER
DEPARTMENT OF STATE

Earlier this year, you asked whether the State Department could authorize the Palestine Liberation Organization ("PLO") to engage in certain diplomatic activities out of its Washington, D.C. office. At the time, the State Department had concluded that these activities, which included communications with the U.S. government, would advance U.S. efforts to promote peace between Israel and the Palestinians, and that barring the PLO from engaging in these activities would interfere with U.S. diplomacy.[1] Your formal request followed an informal inquiry in November 2017.

These requests arose because the Secretary of State had determined that he could no longer make the required certification under the federal appropriations law that would permit the waiver of section 1003 of the Anti-Terrorism Act of 1987 ("ATA"), Pub. L. No. 100-204, tit. X, § 1003, 101 Stat. 1331, 1406, 1407 (1987). Section 1003 bars the PLO from maintaining its Washington office or from expending funds in the United States to promote the PLO's interests, including the diplomatic activities that the State Department wished to authorize. 22 U.S.C. § 5202(2), (3). If section 1003 were constitutional, then the PLO was obliged to close its Washington office immediately and to cease funding its activities in the United States.

When the question first arose, we informally advised, consistent with this Office's prior position, that such restrictions would encroach upon

---

[1] *See* Letter for Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, from Jennifer G. Newstead, Legal Adviser, Dep't of State at 1 (Apr. 23, 2018) ("State Opinion Request"); E-mail for Sarah Harris, Deputy Assistant Attorney General, Office of Legal Counsel, from Mary Mitchell, Assistant Legal Adviser, Dep't of State, *Re: PLO Office Opinion Request – Responses to Questions* att. at 4–6 (May 31, 2018, 10:54 PM) ("May 31, 2018 E-mail").

the President's exclusive constitutional authority to conduct diplomatic relations. On April 23, 2018, you requested a formal opinion on the subject. Before we completed that opinion, however, the State Department concluded that the PLO had failed to use its Washington office to engage in direct and meaningful negotiations on achieving a comprehensive peace settlement and, therefore, that closing the PLO's Washington office would serve the foreign policy interests of the United States.

This memorandum explains the basis for the informal advice that the State Department relied upon in authorizing the PLO's Washington office to remain open between November 2017 and September 2018. Under the Constitution, the President has the exclusive authority to receive foreign diplomatic agents in the United States and to determine the conditions under which they may operate. Since the enactment of the ATA in 1987, Presidents have consistently recognized the statute's potential constitutional infirmity, and this Office has twice concluded that Congress may not prohibit the President from authorizing the PLO to conduct diplomatic activities in the United States. In keeping with that established position, we advised that the ATA may not constitutionally bar the PLO from maintaining its Washington office and undertaking diplomatic activities the Secretary of State wishes to authorize. The Executive Branch may also close the PLO's Washington office, consistent with the ATA's restrictions. But the Constitution requires that the President retain the flexibility to calibrate the United States' diplomatic contacts as circumstances warrant.

## I.

The PLO was established in 1964 for the purpose of working on behalf of "the Palestinian Arab people" to "liberate its homeland" through armed conflict with the State of Israel. *See* Palestinian National Charter intro. & art. 25 (1964). For several decades, the PLO pursued those aims through acts of violence, often directed against civilians in Israel and the rest of the world. During that period, the United States refused to maintain any relations with the PLO. *See* State Opinion Request, *supra* note 1, at 1 n.4.

In 1974, the United Nations General Assembly granted the PLO the status of an observer in its proceedings as the representative of the Palestinian people. *See* G.A. Res. 3210 (XXIX) (Oct. 14, 1974); G.A. Res.

3237 (XXIX) (Nov. 22, 1974). In 1978, the PLO opened a Washington information office to act as "the 'voice' of the PLO in the United States." *Constitutionality of Closing the Palestine Information Office, an Affiliate of the Palestine Liberation Organization*, 11 Op. O.L.C. 104, 105 (1987) ("*Palestine Information Office*"). The State Department closed that office in 1987 because individuals and organizations affiliated with the PLO committed and supported acts of terrorism. *See* Determination and Designation of Benefits Concerning Palestine Information Office, 52 Fed. Reg. 37,035 (Oct. 2, 1987).

Shortly thereafter, on December 22, 1987, Congress enacted the ATA, a statute "unique" in "the long history of Congressional enactments." *United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1460 (S.D.N.Y. 1988). In section 1002 of the ATA, Congress "determine[d] that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law and should not benefit from operating in the United States." 22 U.S.C. § 5201(b). Section 1003 of the Act provides in full:

> It shall be unlawful, if the purpose be to further the interests of the [PLO] or any of its constituent groups, any successor to any of those, or any agents thereof, on or after the effective date of this chapter—
>
> (1) to receive anything of value except informational material from the PLO or any of its constituent groups, any successor thereto, or any agents thereof;
>
> (2) to expend funds from the PLO or any of its constituent groups, any successor thereto, or any agents thereof; or
>
> (3) notwithstanding any provision of law to the contrary, to establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the [PLO] or any of its constituent groups, any successor to any of those, or any agents thereof.

22 U.S.C. § 5202. Section 1004 provides that the Attorney General "shall take the necessary steps and institute the necessary legal action to effectuate the policies and provisions of" the ATA. *Id*. § 5203(a). Section 1005(b) states that the ATA's provisions "shall cease to have effect if the

President certifies . . . that the [PLO], its agents, or constituent groups thereof no longer practice or support terrorist actions anywhere in the world." 22 U.S.C. § 5201 note.

At the time of the ATA's passage, the United States did not maintain any relations with the PLO, and the Executive Branch had already shut down the PLO's Washington office. Nonetheless, in signing the ATA into law, President Reagan expressed concern that its provisions would infringe upon the President's exclusive authority to conduct the Nation's diplomatic affairs. As he explained in his signing statement:

> Section 1003 of the Act prohibits the establishment anywhere within the jurisdiction of the United States of an office "to further the interests of" the Palestine Liberation Organization. The effect of this provision is to prohibit diplomatic contact with the PLO. I have no intention of establishing diplomatic relations with the PLO. However, the right to decide the kind of foreign relations, if any, the United States will maintain is encompassed by the President's authority under the Constitution, including the express grant of authority in Article II, Section 3, to receive ambassadors. I am signing the Act, therefore, only because I have no intention of establishing diplomatic relations with the PLO, as a consequence of which no actual constitutional conflict is created by this provision.

*Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989* (Dec. 22, 1987), 2 Pub. Papers of Pres. Ronald Reagan 1541, 1542 (1987).[2]

In 1993, in connection with the Oslo Accords, the PLO renounced terrorism and recognized Israel's right to exist, and Israel recognized the PLO as the representative of the Palestinian people for purposes of negotiations for permanent status and peace. State Opinion Request, *supra* note 1, att. at 3 & n.8. In June 1994, the State Department authorized the

---

[2] The PLO has also maintained a United Nations observer mission in New York since 1974. In 1988, a district court held that section 1003(3) did not require closing that mission because the ATA should not be read to abrogate the United States' treaty obligations under the United Nations Headquarters Agreement, which applies to U.N. missions. *PLO*, 695 F. Supp. at 1468–71. The United States did not appeal this ruling. Accordingly, the PLO has maintained that U.N. mission for several decades notwithstanding section 1003.

PLO to open a foreign mission in Washington. *See* Letter for Hasan Abdel Rahman, Palestine Affairs Office, from Eric J. Boswell, Director, Office of Foreign Missions, Dep't of State (June 22, 1994) ("Boswell Letter"). Congress, in the Middle East Peace Facilitation Act of 1993, also authorized President Clinton to suspend section 1003 of the ATA, and later authorized that suspension in annual appropriations riders.[3] In authorizing the opening of a foreign mission, the State Department advised the PLO that its members would lack diplomatic status and that they must continue to meet the requirements of the suspension. Boswell Letter at 1–2.

Since 1994, Presidents have routinely exercised their authority to waive section 1003's requirements. In signing appropriations bills, however, Presidents on several occasions have reiterated President Reagan's concern and advised that the conditions of certification could unconstitutionally restrict the President's authorities over foreign affairs.[4] Despite those

---

[3] *See, e.g.*, Middle East Peace Facilitation Act of 1993, Pub. L. No. 103-125, § 3(b)(2), (d)(2), 107 Stat. 1309, 1310 (authorizing temporary waiver if the President certified that it advanced the national interest and that the PLO was abiding by its Oslo Accords commitments); Middle East Peace Facilitation Act of 1994, Pub. L. No. 103-236, tit. V, pt. E, § 583(a), (b)(2), 108 Stat. 382, 488, 488–89 (same); Foreign Operations, Export Financing, and Related Programs Appropriations Act, 1998, Pub. L. No. 105-118, § 539(d), 111 Stat. 2386, 2417–18 (authorizing six-month waiver if President certified it was "important to the national security interests of the United States"); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2012, Pub. L. No. 112-74, div. I, § 7086(b), 125 Stat. 786, 1164, 1265 (authorizing six-month waiver if the President certified that Palestinians had not obtained member state standing in the United Nations).

[4] *See, e.g.*, *Statement on Signing the Consolidated Appropriations Act, 2017*, 2017 Daily Comp. Pres. Doc. No. 312, at 1 (May 5, 2017) (Pres. Trump) ("Numerous provisions could, in certain circumstances, interfere with the exercise of my constitutional authorities . . . to receive ambassadors . . . and to recognize foreign governments[.]"); *Statement on Signing the Consolidated Appropriations Act, 2012* (Dec. 23, 2011), 2 Pub. Papers of Pres. Barack Obama 1568, 1569 (2011) ("Certain provisions in Division I . . . , including section[] 7086, hinder my ability to receive diplomatic representatives of foreign governments."); *Statement on Signing the Consolidated Appropriations Legislation for Fiscal Year 2000* (Nov. 29, 1999), 2 Pub. Papers of Pres. William J. Clinton 2156, 2160 (1999) ("This legislation includes a number of provisions . . . regarding the conduct of foreign affairs that raise serious constitutional concerns. . . . [S]ome provisions would constrain . . . the exercise of my exclusive authority to receive ambassadors and to conduct diplomacy."); *see also, e.g.*, *Statement on Signing the Palestinian Anti-Terrorism Act of 2006* (Dec. 21, 2006), 2 Pub. Papers of Pres. George W. Bush 2221, 2221 (2006) (objecting to a provision purporting to prevent the Palestinian Authority from establishing a U.S. office); *Statement on Signing the Foreign Relations Authorization Act, Fiscal Year*

concerns, each year, the President or the Secretary of State (to whom the President later delegated the waiver authority) issued the required certification and waived the restrictions of section 1003.[5]

That changed in the fall of 2017. The 2017 waiver provision authorized the President to suspend the ATA only if he were able to certify both that the Palestinians had not attained formal status within the United Nations and that they had not taken any actions to prompt the International Criminal Court ("ICC") to investigate alleged crimes committed by Israeli nationals against Palestinians. *See* Department of State, Foreign Operations, and Related Programs Appropriations Act, 2017, Pub. L. No. 115-31, div. J, § 7041(*l*)(2)(B), 131 Stat. 135, 589, 667–68. On November 15, 2017, the Secretary of State concluded that he could not make this required certification. State Opinion Request, *supra* note 1, att. at 2.

On November 17, the State Department informed the PLO that the waiver of statutory restrictions had lapsed, instructed the PLO to cease operations at its Washington office, and promised further guidance after additional review. Letter for Husam Zomlot, Chief Representative, General Delegation of the PLO, from Cliff Seagroves, Acting Director, Office of Foreign Missions, Dep't of State (Nov. 17, 2017). Ten days later, State advised that the Washington office could continue to engage in activities "that support the objective of achieving a lasting, comprehensive peace between the Israelis and Palestinians." Letter for Husam Zomlot, Chief Representative, General Delegation of the PLO, from Cliff Seagroves, Acting Deputy Director, Office of Foreign Missions, Dep't of State (Nov.

---

*2003* (Sept. 30, 2002), 2 Pub. Papers of Pres. George W. Bush 1697, 1698 (2002) (objecting to a provision requiring the President to rescind any section 1003 waiver upon certain triggering events, and advising that the Executive Branch would comply with that requirement only to the extent the President deemed it consistent with his foreign-affairs responsibilities).

[5] *See, e.g.*, Waiver and Certification of Statutory Provisions Regarding the Palestine Liberation Organization Office (Apr. 10, 2013), 78 Fed. Reg. 25,780 (May 2, 2013); Waiver and Certification of Statutory Provisions Regarding the Palestine Liberation Organization, Pres. Determination No. 01-13 (Apr. 17, 2001), 66 Fed. Reg. 20,585 (Apr. 24, 2001); Lifting Restrictions on U.S. Relations with the Palestine Liberation Organization, Pres. Determination No. 94-13 (Jan. 14, 1994), 59 Fed. Reg. 4777 (Feb. 1, 1994). In 2010, the President delegated his certification authority to the Secretary of State. *See* Delegation of Certain Functions and Authorities (July 21, 2010), 75 Fed. Reg. 43,795 (July 26, 2010); *see also* 3 U.S.C. § 301.

27, 2017). State further advised that, under the FY 2017 waiver provision, a secondary waiver might be available if the Secretary "determine[d] that the Palestinians ha[d] entered into direct and meaningful negotiations with Israel." *Id*. State informs us that the PLO still has not returned to meaningful negotiations. *See* State Opinion Request, *supra* note 1, att. at 3.

Although the FY 2017 waiver provision has expired, the FY 2018 waiver provision, which was enacted on March 23, 2018, is materially similar, and the Secretary of State cannot make the required certification.[6] The Secretary also cannot recommend that the President certify that the PLO, its agents, or its constituent groups no longer practice or support terrorism, so as to invoke the termination provision in section 1005(b) of the ATA.[7] By its terms, then, section 1003 bars the PLO from maintaining its Washington office or expending any funds to support the PLO's activities in the United States.

In your April 23, 2018 opinion request, you advised that section 1003 would prevent the President from conducting diplomacy with the PLO and therefore would unconstitutionally encroach upon the President's exclusive authority to receive ambassadors and to conduct foreign affairs. *See* State Opinion Request, *supra* note 1, att. at 9–11. The State Department believes that it may authorize the PLO to engage in diplomatic activities if, in the judgment of the Executive Branch, those activities would support the United States' foreign policy objective of fostering a lasting peace between Israelis and Palestinians. The State Department believes that this authority would extend to authorizing the PLO to (1) maintain its Washington office; (2) maintain regular contact with U.S. officials and engage with foreign government interlocutors in Washington on diplomatic

---

[6] Congress kept the same general waiver criteria, but modified the ICC condition slightly, requiring certification that the PLO had not "initiated or actively supported an ICC investigation against Israeli nationals for alleged crimes against Palestinians." Department of State, Foreign Operations, and Related Programs Appropriations Act, 2018, Pub. L. No. 115-141, div. K, § 7041(m)(2)(B)(i)(II), 132 Stat. 348, 833, 911–12.

[7] The State Department informs us that certain groups (including the Popular Front for the Liberation of Palestine, the Democratic Front for the Liberation of Palestine, and the Palestine Liberation Front) designated as terrorist organizations under Executive Order 12947 (Jan. 23, 1995), 60 Fed. Reg. 5079, 5081 (Jan. 25, 1995), have not sufficiently dissociated from the PLO to allow this certification. State Opinion Request, *supra* note 1, att. at 1 n.1.

matters; (3) report to Palestinian leadership on relevant developments; (4) engage in public diplomacy; and (5) provide financial and administrative support for these activities. *See* May 31, 2018 E-mail, *supra* note 1, att. at 1, 4–8.

On September 10, 2018, the State Department ordered the PLO to close its Washington office. The State Department explained that "the PLO Office is not currently engaged in activities that support the U.S. objective of achieving a lasting, comprehensive peace" and thus that the United States would no longer permit the office to operate. Letter for Husam Zomlot, Chief Representative, General Delegation of the PLO, from Cliff Seagroves, Acting Director, Office of Foreign Missions, Dep't of State (Sept. 10, 2018).

## II.

We agree that Congress may not constitutionally require the PLO to close its office and cease performing other diplomatic activities, should the Executive Branch wish to authorize them. In so doing, section 1003 of the ATA would intrude upon the diplomatic powers that "the Constitution grants to [the President] alone." *Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2084 (2015) (citing *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring)). On several prior occasions, this Office has reviewed section 1003 or similar restrictions and advised that they could not constitutionally obstruct the Executive's ability to facilitate relations with the PLO in the United States. We reach the same conclusion here.

Before the ATA's enactment in 1987, this Office had advised that two proposed bills similar to section 1003 would have been unconstitutional. *Palestine Information Office*, 11 Op. O.L.C. at 122. We explained that "[t]he right to decide whether to accord to the PLO diplomatic status and what that diplomatic status should be is encompassed within the right of the President to receive ambassadors," a power "textually committed to the Executive alone." *Id*. The proposed provisions would be a "serious infringement" on the President's foreign-affairs authorities because they purported to forbid the President, "as a practical matter," from "establish[ing] diplomatic relations with the PLO" unless he certified that the PLO had renounced terrorism. *Id*.

Following the enactment of the ATA, we advised that Congress could require the closure of the PLO's U.N. observer mission in New York only because the President had not, to that point, engaged in any relations with the PLO. *See* Memorandum for Edwin Meese III, Attorney General, from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, *Re: Intent and Constitutionality of Legislation Prohibiting the Maintenance of an Office of the Palestine Liberation Organization in the United States* at 23–24 (Feb. 13, 1988) ("1988 Cooper Memorandum"). In upholding section 1003, we cautioned that "this is a situation where Congress has power to act so long as the President has not." *Id*. at 22. The President had not, "in the case of the PLO, chosen to invoke his constitutional authority either to receive ambassadors or to conduct foreign affairs" by "recogniz[ing] the PLO formally," by "establish[ing] an official relationship with the PLO and with its representatives," or by taking actions short of recognition whereby the President "permits the alien representatives to enter the United States or conduct negotiations with our representatives." *Id*. at 20, 22–23 & n.23. If the President chose to take any of these actions, thereby invoking his "exclusive constitutional powers in the area of foreign affairs," such action would "serve to shield the PLO Mission from the operation of the Act." *Id*. at 18, 24. Absent such actions, however, section 1003's restrictions on the PLO did not impair the President's exclusive authority over diplomacy because those restrictions fell within Congress's Article I powers and did not interfere with the decision of the Executive Branch not to engage with the PLO.

We agree with those conclusions. The Constitution vests the President with the exclusive authority to conduct diplomacy on behalf of the United States. That authority includes determining whether to recognize a foreign entity as a sovereign and, if not, the degree of relations the United States should maintain with it. That authority also includes the power to receive and expel foreign representatives, and to determine the scope of their diplomatic activities in the United States. If the President chooses to maintain diplomatic contacts with the PLO and to permit the organization to maintain a foreign mission in the United States, then Congress may not intrude on that choice by ordering the closure of the PLO's Washington office or by prohibiting the PLO from engaging in the diplomatic activities authorized by the Executive Branch.

## A.

The President has "unique responsibility" for the conduct of "foreign . . . affairs," *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993), and "the lead role . . . in foreign policy," *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 767 (1972). The Constitution grants the President a host of express powers concerning foreign affairs: to "receive Ambassadors and other public Ministers," U.S. Const. art. II, § 3, to "make Treaties" and "appoint Ambassadors" with the consent of the Senate, *id.* art. II, § 2, cl. 2, and to exercise authority as Commander in Chief, *id.* art. II, § 2, cl. 1. Congress, too, has powers touching upon foreign affairs, such as the powers "[t]o regulate Commerce with foreign Nations," "[t]o establish an uniform Rule of Naturalization," and "[t]o declare War." *Id.* art. I, § 8. But the Constitution vests in the President "[t]he Executive power," *id.* art. II, § 1, which includes the "vast share of responsibility for the conduct of our foreign relations" and "independent authority in the areas of foreign policy and national security." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 414, 429 (2003) (internal quotation marks omitted).[8]

Within this sphere of presidential power, it is "well settled that the Constitution vests the President with the exclusive authority to conduct the Nation's diplomatic relations with other States." *Presidential Certification Regarding the Provision of Documents to the House of Representatives Under the Mexican Debt Disclosure Act of 1995*, 20 Op. O.L.C. 253, 267 (1996); *see also id.* at 267 n.41. Although the President and Congress have overlapping authority in some areas, the President has "a unique role

---

[8] *See, e.g.*, *Dep't of the Navy v. Egan*, 484 U.S. 518, 529 (1988) ("The Court also has recognized the generally accepted view that foreign policy [is] the province and responsibility of the Executive."); *Haig v. Agee*, 453 U.S. 280, 293–94 (1981) (same); *Zivotofsky v. Kerry,* 135 S. Ct. 2076, 2097–2101 (2015) (Thomas, J., concurring in the judgment in part and dissenting in part); *Ludecke v. Watkins*, 335 U.S. 160, 173 (1948) (the President is the country's "guiding organ in the conduct of our foreign affairs," and possesses "vast powers in relation to the outside world"); *Kumar v. Republic of Sudan*, 880 F.3d 144, 157 (4th Cir. 2018) (recognizing "the Constitution's grant to the Executive Branch—not the Judicial Branch—of broad oversight over foreign affairs"); *Nat'l Petrochemical Co. of Iran v. M/T Stolt Sheaf*, 860 F.2d 551, 555 (2d Cir. 1988) ("The President alone" is "the constitutional guardian of foreign policy[.]"); 10 Annals of Cong. 613 (Mar. 7, 1800) (statement of then-Rep. John Marshall) ("The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations.").

in communicating with foreign governments," and Congress may not compel the President to contradict that message. *Zivotofsky*, 135 S. Ct. at 2090–91, 2095. Thus, in *Zivotofsky,* the Supreme Court held unconstitutional a statute requiring U.S. passports to acknowledge Israeli sovereignty over Jerusalem on the ground that the law intruded upon the President's exclusive authority to recognize foreign sovereigns. *Id*. at 2085–86. The Court reasoned that "[r]ecognition is a topic on which the Nation must 'speak . . . with one voice,'" and "[t]hat voice must be the President's" because "[t]he President is capable, in ways Congress is not, of engaging in the delicate and often secret diplomatic contacts that may lead to a decision on recognition." *Id*. (quoting *Garamendi*, 539 U.S. at 424) (ellipsis in original). Whereas "the President has the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers," the Court explained, Congress "has no constitutional power that would enable it to initiate diplomatic relations with a foreign nation." *Id*.

The President's exclusive authority over diplomacy flows from the text of the Constitution and a long line of "accepted understandings and practice" by all three branches of government. *Id*. at 2091. The President alone decides whether to recognize a foreign sovereign. *Id*. at 2084. The President can "open diplomatic channels" through direct diplomacy, or can instead insist that those channels stay closed. *Id*. The President decides whom to nominate as ambassador and unilaterally "dispatches other diplomatic agents." *Id*. at 2086. The President "has the sole power to negotiate treaties," *id*., and Congress may not require the President to "initiate discussions with foreign nations" or prevent them from occurring, *Earth Island Inst*. *v*. *Christopher*, 6 F.3d 648, 652–53 (9th Cir. 1993).[9] In sum, the President has the sole role in deciding "whether, how,

---

[9] *Accord, e.g*., *United States v*. *Louisiana*, 363 U.S. 1, 35 (1960) (The President is "the constitutional representative of the United States in its dealings with foreign nations."); *Prohibition of Spending for Engagement of the Office of Science and Technology Policy with China*, 35 Op. O.L.C. 116, 121 n.2 (2011) ("*OSTP Engagement with China*") ("[T]he courts, the Executive, and Congress have all concurred that the President's constitutional authority specifically includes the exclusive authority to represent the United States abroad.") (quotations omitted); *Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1992 and 1993* (Oct. 28, 1991), 2 Pub. Papers of Pres. George Bush 1344, 1344 (1991) ("[U]nder our system of government, all decisions concerning the conduct of negotiations with foreign governments are within the exclusive control of the

when, and through whom to engage in foreign diplomacy." *Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That Support International Terrorism*, 33 Op. O.L.C. 221, 230 (2009) ("*Delegations to U.N. Agencies*").

Similarly, the President alone determines which foreign agents may come into the United States, how long they may stay, and what diplomatic activities they may carry out while here. The Reception Clause empowers the President alone to "receive Ambassadors and other public Ministers." U.S. Const. art. II, § 3. And this authority includes whether to accept the request by foreign sovereigns to send particular dignitaries and to assure them of entry. *See Presidential Power to Expel Diplomatic Personnel from the United States*, 4A Op. O.L.C. 207, 208–09, 215 (1980) ("*Presidential Power to Expel Diplomatic Personnel*"). As early as 1793, the Washington Administration considered it self-evident that the President alone would decide when to recognize the new French government and receive its minister. *See Zivotofsky*, 135 S. Ct. at 2091–92; Saikrishna Prakash & Michael Ramsey, *The Executive Power over Foreign Affairs*, 111 Yale L.J. 231, 312–13 (2001) ("*Prakash & Ramsey*").

Congress, too, shared this understanding in the early Republic. As the Supreme Court discussed in *Zivotofsky*, in 1818, the House of Representatives took up the question of whether to recognize the new South American republics that had broken away from Spain. 135 S. Ct. at 2092. Speaking in opposition, Representative Alexander Smyth explained, "it is the President who receives all foreign Ministers, and determines what foreign Ministers shall or shall not be received. It is by the exercise of one of these powers, in neither of which has this House any participation, that a foreign Power must be acknowledged." 32 Annals of Cong. 1569–70 (Mar. 27, 1818). The House voted down the bill and deferred any efforts toward recognition until after President Monroe made that decision, four years later. This episode reflected the early congressional understanding

---

President."); *Authority to Participate in International Negotiations*, 2 Op. O.L.C. 227, 228 (1978) ("Negotiation is a necessary part of the process by which foreign relations are conducted, and the power to conduct foreign relations is given to the President by the Constitution."); Louis Henkin, *Foreign Affairs and the United States Constitution* 42 (2d ed. 1996) ("As 'sole organ,' the President determines also how, when, where, and by whom the United States should make or receive [diplomatic] communications" and cannot be "limited as to time, place, form, or forum.").

that "the recognition power rested solely with the President." *Zivotofsky*, 135 S. Ct. at 2092.

Likewise, it has been "beyond serious question" that the President's power to engage with foreign emissaries encompasses the power to expel them from the United States. *Presidential Power to Expel Diplomatic Personnel*, 4A Op. O.L.C. at 209; *accord* 3 Joseph Story, *Commentaries on the Constitution* § 1562, at 418 (1833) ("Story") (the President's reception authority includes "the power to refuse [foreign dignitaries], and to dismiss those who, having been received, become obnoxious to censure, or unfit to be allowed the privilege"). Most famously, in 1793, President Washington demanded the recall of the French minister, Edmond Charles Genet, after Genet embarked on a public campaign to oppose the President's neutrality policy and win American support for France's war against Great Britain. Prakash & Ramsey, 111 Yale L.J. at 314–15; Stanley Elkins & Eric McKitrick, *The Age of Federalism* 341–53, 363–65 (1993) ("Elkins & McKitrick"). Genet contended that only Congress could recall diplomats—but the Washington Administration disagreed, and Congress acquiesced in the administration's position. Prakash & Ramsey, 111 Yale L.J. at 314–15; Elkins & McKitrick at 365. Since then, the Executive has unilaterally decided when to expel foreign representatives. *See generally* 5 John Bassett Moore, *A Digest of International Law*, H.R. Doc. No. 56-551, §§ 700–01, at 19–32 (1906) ("Moore") (citing over a dozen examples). Accordingly, in 1980, this Office concluded that the President had the authority to expel Iranian diplomats and could do so for any reason. *See* Memorandum for the Attorney General, from Larry A. Hammond, Acting Assistant Attorney General, Office of Legal Counsel, *The President's Power to Declare Iranian Diplomats* Persona Non Grata *Because of Their Public Statements* at 1–2 (Mar. 20, 1980).

Congress has accepted the President's authority over the entry and expulsion of foreign diplomats. For instance, the Immigration and Nationality Act, 8 U.S.C. § 1101 *et seq*., has long exempted diplomatic personnel from its provisions. Congress added this general exemption in recognition of "the constitutional limitations on its ability to control or regulate the President's constitutional power to receive (and expel) the foreign representatives of countries with whom we have diplomatic relations." *Presidential Power to Expel Diplomatic Personnel*, 4A Op. O.L.C. at 215; *see also* H.R. Rep. No. 82-1365, at 34 (1952) (explaining that various foreign

diplomats who have been "accepted by the President or the Secretary of State" are generally exempted from provisions relating to admission or removal "[i]n view of constitutional limitations"). On the rare occasions when Congress sought to bar the entry of foreign representatives, Presidents have regularly objected.[10] And for good reason: just as the President's recognition authority will not tolerate a contradictory message from Congress, *Zivotofsky*, 135 S. Ct. at 2095, the President's reception authority similarly prohibits Congress from barring the emissaries whom the President wishes to receive.

The President's foreign-affairs authorities also give him exclusive control over the activities of foreign representatives in the United States. *See, e.g.*, *Tachiona v. United States*, 386 F.3d 205, 213–14 (2d Cir. 2004) (the President possesses the "authority to set the terms upon which foreign ambassadors are received"). Presidents have long set the conditions under which diplomats may operate. For instance, in 1793, Secretary of State Jefferson cautioned Genet that the Executive Branch would "admit the continuance of your functions so long as they shall be restrained within the limits of the law as heretofore announced to you, or shall be of the tenor usually observed towards independent nations by the representative of a friendly power residing with them." Thomas Jefferson to Edmond Charles Genet (Sept. 7, 1793), 27 *The Papers of Thomas Jefferson* 52–53 (John Catanzariti ed., 1997) ("*Jefferson Papers*"). After the French consuls sought to exercise admiralty jurisdiction in the United States to "try the validity of prizes" seized by privateers, Jefferson directed them to stop

---

[10] *OSTP Engagement with China*, 35 Op. O.L.C. at 123 ("Presidents . . . have regularly objected to legislation purporting to bar their interaction with particular foreign officials."); *Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991* (Feb. 16, 1990), 1 Pub. Papers of Pres. George Bush 239, 240 (1990) (declaring provision restricting the President's ability to receive spies as ambassadors to be unconstitutional); *Statement on Signing the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996* (Mar. 12, 1996), 1 Pub. Papers of Pres. William J. Clinton 433, 434 (1996) ("A categorical prohibition on the entry of [individuals who confiscate or traffic in expropriated property] could constrain the exercise of my exclusive authority under Article II of the Constitution to receive ambassadors and to conduct diplomacy"); *Statement on Signing the Countering America's Adversaries Through Sanctions Act*, 2017 Daily Comp. Pres. Doc. No. 559, at 1 (Aug. 2, 2017) (Pres. Trump) (deeming unconstitutional provisions that purported to require the President to "deny certain individuals entry into the United States, without an exception for the President's responsibility to receive ambassadors").

and threatened to "immediately revoke[]" the exequaturs that authorized them to operate in the United States. Thomas Jefferson, Circular to French Consuls and Vice-Consuls (Sept. 7, 1793), 27 *Jefferson Papers* at 51. The Washington Administration similarly advised France that any limitations placed on the jurisdiction of U.S. consuls abroad would result in reciprocal limitations on French consuls in the United States. Prakash & Ramsey, 111 Yale L.J. at 313. Since then, Presidents have set the conditions under which foreign representatives must operate in the United States.[11] This long practice confirms that the President has the sole authority to decide which foreign representatives to receive, what activities they may undertake, and when they must depart.

Congress therefore could not impose restrictions like those in section 1003 upon accredited foreign diplomats in the United States. "[W]hen a Presidential power is 'exclusive,' it 'disabl[es] the Congress from acting upon the subject.'" *Zivotofsky*, 135 S. Ct. at 2095 (quoting *Youngstown*, 343 U.S. at 637–38 (Jackson, J., concurring)); *see OSTP Engagement with China*, 35 Op. O.L.C. at 124–29. Prohibiting representatives of a foreign sovereign from maintaining any office or mission in the United States would be tantamount to prohibiting them from engaging in diplomacy, since missions are "the machinery through which States conduct diplomacy." Denza, *supra* note 11, at 1. So, too, prohibiting foreign diplomats from expending any funds in the United States for the purpose of furthering their sovereign's interests would effectively block those diplomats from discharging their duties. The President's decision to receive a diplomat entails an implicit authorization for the diplomat to perform the

---

[11] *See, e.g.*, 5 Moore § 700, at 20 (noting that in 1855, the Secretary of State threatened to revoke the exequatur of the Portuguese consul in New York if he refused to appear as a witness in prosecuting persons charged with fitting vessels for use in the slave trade); Eileen Denza, *Diplomatic Law: Commentary on the Vienna Convention on Diplomatic Relations* 64 (4th ed. 2016) ("Denza") (noting that power to expel diplomats "enables the receiving State to protect itself against numerous forms of unacceptable activity by members of diplomatic missions and forms an important counterweight to the immunities conferred elsewhere"); *id.* at 409 (describing State Department practices of "cutting of telephone lines, refusal of customs clearance for diplomatic imports, and refusal of permission to purchase private residences" that were taken against the missions of the Soviet Union, China, Czechoslovakia, Iran, Vietnam, and Cambodia); *id.* at 410 ("The Department of State systematically monitors tax exemptions granted to U.S. missions abroad and adjusts the privileges accorded to missions in the United States so as to ensure a high level of reciprocity.").

customary incidents of diplomatic office, unless the President chooses to modify the scope of that authorization.

## B.

The President's exclusive authority over diplomatic affairs extends as well to foreign political organizations, such as the PLO. Because the President's "exclusive and plenary" powers to "receive emissaries from a foreign entity" and to recognize foreign sovereigns "need not be exercised concurrently," the "President's decision to engage in diplomatic activity . . . does not obligate him to recognize the state sending those representatives." 1988 Cooper Memorandum at 22–23 n. 23. Nor must the President accept emissaries as accredited diplomats to invoke his foreign-affairs authorities. The President's reception power extends to "all possible diplomatic agents which any foreign power may accredit to the United States." *Ambassadors and Other Public Ministers of the United States*, 7 Op. Atty. Gen. 186, 209 (1855).[12] So the President may authorize foreign emissaries to enter the United States and engage in diplomatic relations without affording them diplomatic status. The Supreme Court has recognized the President's diplomatic authority includes such informal diplomatic channels. *United States v. Belmont*, 301 U.S. 324, 330 (1937) (it "may not be doubted" that it was "within the competence of the President" alone to engage in negotiations with the Soviet Union before its recognition); *see Zivotofsky*, 135 S. Ct. at 2086 ("The President is capable, in ways Congress is not, of engaging in the delicate and often secret diplomatic contacts that may lead to a decision on recognition."). This Office thus previously concluded that the President has the sole authority to "decide whether to accord to the PLO diplomatic status and what that diplomatic status should be." *Palestine Information Office*, 11 Op. O.L.C. at 122.[13]

---

[12] For instance, at the Founding, consuls were "not diplomatic functionaries, or political representatives of a foreign nation," but were "treated in the character of mere commercial agents." 3 Story § 1559, at 415. Yet, Justice Story explained, the President's sole authority to receive them "has constantly been exercised without objection; and foreign consuls have never been allowed to discharge any functions of office, until they have received the exequatur of the president." *Id*.

[13] *See also Section 609 of the FY 1996 Omnibus Appropriations Act*, 20 Op. O.L.C. 189, 194 (1996) ("The Executive's recognition power necessarily subsumes within itself

Since the Founding, Presidents have received and negotiated with representatives from non-sovereign entities. From 1796 to 1800, following an uprising in the French colony of Saint-Domingue, President Adams accepted agents of the provisional government of Toussaint L'Ouverture. The Adams administration did not recognize L'Ouverture's government or grant his agents diplomatic status, but negotiated with them over trade. *See* Rayford W. Logan, *The Diplomatic Relations of the United States with Haiti 1776–1891*, at 73–76, 105 (1941). Likewise, as other Latin American colonies edged towards independence in the nineteenth century, Presidents Madison, Monroe, and Quincy Adams authorized provisional governments to send agents and received them on an informal basis. Samuel Flagg Bemis, *Early Diplomatic Missions from Buenos Aires to the United States 1811–1824*, 49 Proc. of Am. Antiquarian Soc. 11, 12–13, 55 (Apr. 1939) ("Bemis"); Julius Goebel, Jr., *The Recognition Policy of the United States* 121, 134, 138 (1915) ("Goebel"). Some of these agents remained in the United States for decades to lobby for recognition. Bemis, 49 Proc. of Am. Antiquarian Soc. at 21, 93.

Long before recognizing the Soviet Union, the Executive Branch allowed unofficial Soviet representatives into the United States. In 1921, during the Russian Civil War, the State Department authorized the short-lived Far Eastern Republic—an entity later subsumed within the Soviet Union—to send "responsible persons of good record to whom the Department would extend informal assistance but no official recognition." Svetlana Chervonnaya & Donald Evans, *Left Behind: Boris E. Skvirsky and the Chita Delegation at the Washington Conference, 1921–22*, 29 Intel. & Nat'l Sec. 19, 26 (2014) (internal quotations omitted). That delegation included Boris Skvirsky, who established the Soviet Union Information Bureau, negotiated with U.S. officials, and engaged in public diplomacy as the Soviet Union's unofficial diplomatic representative for

---

the power to withhold or deny recognition, to determine the conditions on which recognition will be accorded, and to define the nature and extent of diplomatic contacts with an as-yet unrecognized government."); *Nat'l Petrochemical Co. of Iran*, 860 F.2d at 554–55 ("[T]he power to deal with foreign nations outside the bounds of formal recognition is essential to a president's implied power to maintain international relations," and "the president alone—as the constitutional guardian of foreign policy—knows what action is necessary to effectuate American relations with foreign governments.").

more than a decade, *id*. at 27, 51, while occupying the "legal status of a private citizen," *id*. at 50 (internal quotations omitted).

During World War II, President Roosevelt admitted Charles de Gaulle, the leader of the French Committee of National Liberation, to the United States for meetings while avoiding recognizing either de Gaulle or the Vichy regime as the legitimate government of France. 2 Marjorie M. Whiteman, *Digest of International Law* § 5, at 129 (1963). The Executive Branch likewise authorized the People's Republic of China to open an unofficial liaison office and granted its representatives certain diplomatic privileges and immunities before recognizing the Communist Chinese government. 2 Jerome Alan Cohen & Hungdah Chiu, *People's China and International Law: A Documentary Study* 1108 (1974). And the Executive Branch permitted breakaway entities like Katanga and Rhodesia, which never attained recognition, to open unofficial U.S. offices and to take actions in the United States to advance their political interests. *See* Josiah Brownell, *Diplomatic Lepers: The Katangan and Rhodesian Foreign Missions in the United States and the Politics of Nonrecognition*, 47 Int'l J. of African Hist. Stud. 209, 213–14, 226–27, 230 (2014).

Congress too has acknowledged the President's authority to engage in diplomacy with non-sovereign entities. The Foreign Missions Act defines a "foreign mission" on U.S. soil to include "any mission to or agency or entity in the United States which is involved in the diplomatic, consular, or other activities of" either (i) "a foreign government," or (ii) "an organization . . . representing a territory or political entity which has been granted diplomatic or other official privileges and immunities under [U.S. law] or which engages in some aspect of the conduct of the international affairs of such territory or political entity." 22 U.S.C. § 4302(a)(3). The statute grants the Secretary of State the discretion to determine which organizations constitute a "foreign mission." *Id*. § 4302(b). Under the Foreign Missions Act, Presidents have authorized the PLO and other foreign entities to open offices and engage in diplomatic activities in the United States.[14]

---

[14] *See, e.g.*, National Coalition of Syrian Revolution and Opposition Forces, 79 Fed. Reg. 27,675 (May 14, 2014) (determining that the offices of the National Coalition of Syrian Revolution and Opposition Forces constitute a foreign mission); Taipei Economic and Cultural Offices, 79 Fed. Reg. 16,090 (Mar. 24, 2014) (determining that the Taipei Economic and Cultural Representative Office in Washington, D.C., and its subsidiary

Similarly, this Office has often concluded that the President's exclusive authority over diplomatic affairs extends to representatives of non-recognized foreign entities. For instance, in 1977, President Carter sought to close Rhodesia's unofficial U.S. office in view of his Administration's foreign policy and a recent U.S.-sponsored United Nations Security Council resolution. This Office advised that, notwithstanding the mission's lack of diplomatic status, its closure fell within the President's exclusive foreign-affairs powers, including "the right to determine who is to be regarded here as representing a foreign state or regime." Letter for the President, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel att. 2, at 7 (Dec. 13, 1977).

This Office also objected to a bill that would have required the Secretary of State to permit the entry of the President of Taiwan to the extent it could be "construed to prevent the President from denying [him] permission to enter the United States." Memorandum for the Files, from Richard Shiffrin, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: H.R. 1460*, at 2 (May 18, 1995). The United States did not recognize Taiwan as a foreign sovereign, the Clinton administration had not decided whether to grant the Taiwanese President diplomatic status, and the Taiwanese President merely sought entry to speak at Cornell University. *Id.* at 1–2. Nonetheless, we concluded that Congress could not require the President to admit him, because doing so "would undermine the President's recognition policy toward" the People's Republic of China. *Id.* at 2–3.

These precedents leave little doubt that Congress may not interfere with the President's authority to engage in diplomatic contacts with non-recognized entities. Foreign political entities that engage with the United States are engaged in diplomacy even if they never attain recognition. If the President did not have the exclusive authority to set the parameters of United States engagement, then Congress could thwart the President's authority to recognize such entities or to calibrate the nature of relations with them. The authority to engage with foreign entities in the United States therefore falls well within the President's exclusive authority.

---

offices throughout the United States constitute foreign missions); Amtorg Trading Corporation, 52 Fed. Reg. 5,373 (Feb. 20, 1987) (authorizing the de facto Soviet trade delegation to operate a mission).

This conclusion is consistent with the course of United States relations with the PLO. Although the United States has never recognized the PLO as a foreign sovereign, the United States maintained relations with the PLO for over two decades, and Presidents have repeatedly objected to legislative efforts to cabin such engagement.[15] Since 1994, Presidents have engaged with the PLO as the international representative of the Palestinian people. *See* State Opinion Request, *supra* note 1, att. at 1. The State Department authorized the PLO to maintain a foreign mission in Washington, D.C., in the expectation that PLO representatives should "have ready access to State Department officials on matters of mutual concern" and be "invited to official U.S. functions on a case by case basis." Boswell Letter at 2. If the Executive Branch wishes to authorize the PLO to conduct such diplomatic activities, Congress may not constitutionally bar such engagement.

## C.

The President's exclusive authority over diplomatic affairs necessarily implies the discretion to permit the PLO to maintain a mission within the United States. Since the early days of the Nation, the Executive Branch has allowed non-recognized entities to send agents to the United States to reside on a long-term basis and establish diplomatic contacts. Forbidding these entities from establishing an office from which to operate would cut off a critical conduit for such relations. *Cf*. Denza, *supra* note 11, at 1 (missions are "the machinery through which States conduct diplomacy").

---

[15] *See supra* note 4; *accord, e.g.*, *Delegations to U.N. Agencies*, 33 Op. O.L.C. at 232 ("[T]he Executive Branch has objected numerous times on constitutional grounds to legislative provisions purporting to preclude any U.S. government employee from negotiating with (or recognizing) the [PLO] or its representatives until the PLO had met certain conditions."); *Statement on Signing the Consolidated Appropriations Act, 2012* (Dec. 23, 2011), 2 Pub. Papers of Pres. Barack Obama 1568, 1569 (2011) (prohibition on establishing an office in Jerusalem for the purpose of conducting official business with the Palestinian Authority would "hinder my ability to receive diplomatic representatives of foreign governments"); *Statement on Signing the Foreign Relations Authorization Act, Fiscal Years 1990 and 1991* (Feb. 16, 1990), 1 Pub. Papers of Pres. George Bush 239, 240 (1990) (objecting to a statute prohibiting the use of any funds to continue "the current dialogue on the Middle East peace process" with any PLO representatives known to have been directly involved in terrorist activity because such a prohibition interferes with the President's "constitutional authority to negotiate with foreign organizations").

Therefore, at a minimum, Congress may not prohibit the PLO from maintaining an office dedicated to conducting relations with the United States should the Executive seek to facilitate such relations.

The question remains whether additional PLO activities fall within the President's exclusive authority over diplomacy. In light of the State Department's expertise in this area, we give great weight to its views regarding whether particular activities are diplomatic in nature. *See Issues Raised by Provisions Directing Issuance of Official or Diplomatic Passports*, 16 Op. O.L.C. 18, 21 (1992) ("defer[ring] to the State Department's expertise" concerning the foreign policy consequences of a proposed bill); *OSTP Engagement with China*, 35 Op. O.L.C. at 125 (relying on the State Department's judgments as to how integral particular activities are to the conduct of diplomacy); *Delegations to U.N. Agencies*, 33 Op. O.L.C. at 235 (deferring to the State Department's conclusion that a legislative restriction on its participation in negotiations would undermine U.S. diplomacy); *cf. United States v. Al-Hamdi*, 356 F.3d 564, 571–72 (4th Cir. 2004) (treating the State Department's views as conclusive regarding whether a foreign representative possesses diplomatic status in light of the President's foreign-affairs authorities). We also consider whether these activities constitute a necessary incident of diplomacy by looking to the historical practices of the Executive Branch. *See Zivotofsky*, 135 S. Ct. at 2091 (examining "accepted understandings and practice").

Based on these criteria, we believe that the specific activities that the State Department identified are necessary incidents of engaging the PLO in diplomatic contact with the United States. The State Department may authorize the PLO to meet with U.S. and foreign officials in the United States. Indeed, the whole point of allowing a foreign representative to enter the United States and establish an office is to foster such contacts, whether they are with representatives of the U.S. government or with members of the foreign diplomatic corps. *Cf. OSTP Engagement with China*, 35 Op. O.L.C. at 125 (Congress has no authority to limit meetings between U.S. and Chinese officials abroad because such contacts "fall squarely within the scope of the President's constitutional authority to engage in discussions with foreign governments").

Likewise, the State Department may authorize the PLO's Washington office to communicate with its leadership abroad. There would be few surer ways of thwarting the President's diplomatic efforts than to bar

foreign representatives from reporting on developments within the United States. *Cf.* Denza, *supra* note 11, at 29 ("The function of a diplomatic mission" includes "report[ing] to the sending government on all matters of importance to it"); Vienna Convention on Diplomatic Relations art. 3.1(d), Apr. 18, 1961, 500 U.N.T.S. 95, 98 (functions of diplomatic missions include "[a]scertaining by all lawful means conditions and developments in the receiving State, and reporting thereon to the Government of the sending State"); 2 Foreign Affairs Manual ("FAM") 113.1.c.10 (responsibilities of a U.S. Chief of Mission include "reporting significant political, economic, and societal developments occurring abroad").

The State Department also identified various forms of public diplomacy—namely, "outreach to Palestinian-Americans, Palestinians in the United States, or interested Americans on matters relevant to the Palestinian community." May 31, 2018 E-mail, *supra* note 1, att. at 7. That, too, is a typical and accepted incident of diplomacy. *See, e.g.*, Vienna Convention on Diplomatic Relations art. 3(b), (e) (the functions of a diplomatic mission include "[p]rotecting in the receiving State the interests of the sending State and of its nationals" and "[p]romoting friendly relations between the sending State and the receiving State, and developing their economic, cultural and scientific relations."); Richard T. Arndt, *The First Resort of Kings: American Cultural Diplomacy in the Twentieth Century* 12–15 (2005) (upon their reception as the United States' earliest ambassadors to France, Benjamin Franklin and later Thomas Jefferson published information and engaged with influential French citizens in an effort to correct misimpressions about America); *accord, e.g.*, 1 FAM 114.2 (describing functions of "[a] bureau's public diplomacy office"). Representatives of non-recognized entities have long been permitted to pursue such activities in the United States. In 1835, for example, Texas declared independence from Mexico and the provisional government sent three commissioners here, in part to enlist "public sympathy" for their cause. Goebel at 145. In the twentieth century, representatives of the Soviet Union, Rhodesia, and Katanga likewise engaged in extensive public diplomatic efforts in the United States in support of their governments. *See supra* p. 17.

Logistical and financial services provided to support PLO representatives' official trips to meet with high-level U.S. officials are also necessary incidents of diplomacy. *Cf. OSTP Engagement with China*, 35 Op.

O.L.C. at 127 (activities "necessary to carry out meaningful diplomatic initiatives" fall within the President's exclusive authority over diplomacy). Without such support, those diplomatic trips might not happen. *Cf. id.* (Congress could not restrict U.S. officials' preparation and logistical support for diplomatic meetings, including the arrangement of travel and lodging). For similar reasons, financial and administrative activities related to diplomatic efforts, such as maintaining bank accounts and paying bills, are necessary incidents of diplomacy. Just as the President could not conduct diplomacy abroad without the ability to make "expenditures [necessary] for preparation, support, and facilitation of diplomatic discussion," *id.*, depriving foreign representatives of the ability to perform these basic functions would prevent them from operating in our country. We therefore conclude that section 1003 may not prohibit such diplomatic activities if the Executive Branch wishes to authorize them.

In reaching this conclusion, we are mindful that the Executive Branch has at times acted consistently with section 1003's restrictions. For example, in authorizing the PLO's Washington mission in 1994, the State Department instructed the PLO that the mission could stay open only if the President could continue complying with the ATA waiver provision. *See* Boswell Letter at 1. And in 1997, State directed the PLO to suspend its Washington office because Congress had allowed the statutory waiver authority to lapse. *See* Letter for Hasan Abdel Rahman, Chief Representative, Palestine Liberation Organization, from Eric J. Boswell, Assistant Secretary of State for Diplomatic Security (Aug. 8, 1997).

At the same time, we must judge those episodes against the broader executive practice. Those episodes may well reflect the Executive Branch's determination that compliance with section 1003 would support the President's diplomatic objectives or his efforts to win support for a renewed waiver authority. *See, e.g.*, *Zivotofsky*, 135 S. Ct. at 2107 (Thomas, J., concurring in part and dissenting in part) ("[T]he argument from Presidential acquiescence here is particularly weak" where the "statute is consistent with the President's longstanding policy"); *Haig v. Agee*, 453 U.S. 280, 302 (1981) ("[T]he continued validity of a power is not diluted simply because there is no need to use it."). Moreover, those episodes must be considered against the Executive Branch's repeated objections to the actual or potential burdens imposed by section 1003, including this Office's two opinions on the subject, President Reagan's 1987 signing

statement, and statements of Presidents since objecting as a matter of constitutional principle to the ATA and similar restrictions.

We also do not dispute that some of section 1003's prohibitions may otherwise be justified as regulations of commerce within the United States. Congress has the authority under Article I to regulate any non-diplomatic activities conducted by the PLO, but those measures may not invade the President's exclusive authority over diplomacy.[16] In addition, although Congress has reduced section 1003's potential for interference by permitting the President to waive section 1003's prohibitions, that waiver provides no help if its conditions are not met and the Executive Branch wishes to authorize the PLO's Washington office to remain open and to engage in particular diplomatic activities. To the extent that the conditions for the waiver stand in the way, Congress may not "burden or infringe the President's exercise of a core constitutional power by attaching conditions precedent to the exercise of that power." *Placing of United States Armed Forces Under United Nations Operational or Tactical Control*, 20 Op. O.L.C. 182, 186–88 (1996) (concluding that a provision allowing the President to waive a restriction on national security grounds with advance notice to Congress was insufficiently protective of his exclusive authority to control when and where to deploy U.S. forces). Congress has not granted the President the authority to waive section 1003 for purely diplomatic reasons, and the provision therefore impermissibly constrains the President's exclusive authority over the conduct of diplomacy.

In sum, if the President chooses to allow the PLO to pursue diplomatic endeavors in the United States, then Congress may not impede that decision. For that reason, we informally advised the State Department that the PLO's Washington office could remain open between November 2017 and September 2018. By the same token, if the President determines that

---

[16] *See, e.g.*, *OSTP Engagement with China*, 35 Op. O.L.C. at 124 (although "Congress may use its spending power to decline to appropriate money or place conditions on its appropriations," it cannot use that power to circumvent the President's exclusive foreign-affairs authorities); *Delegations to U.N. Agencies*, 33 Op. O.L.C. at 237 ("[T]he Executive Branch has long adhered to the view that Congress cannot use the appropriations power to control a Presidential power that is beyond its direct control." (citations and quotation marks omitted)); *The President's Compliance with the "Timely Notification" Requirement of Section 501(b) of the National Security Act*, 10 Op. O.L.C. 159, 169–70 (1986) (similar).

closing the PLO office and enforcing section 1003's restrictions is in the interest of United States foreign policy, that action too would fall within his exclusive authority over the conduct of diplomacy. *See* 1988 Cooper Memorandum at 22; *supra* note 4. On September 10, 2018, the Executive Branch made that determination, and the PLO's Washington office must now cease operating unless or until the President deems it within the interest of the United States to reopen.

### III.

For the foregoing reasons, we advised that Congress could not require the Secretary of State to close the PLO's Washington office or to prohibit the PLO from performing the diplomatic activities described in this opinion.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*
